Laura H. King (MT Bar No. 13574)
Shiloh S. Hernandez (MT Bar No. 9970)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone (LK): (406) 204-4852
Phone (SH): (406) 204-4861
E-mail: king@westernlaw.org
E-mail: hernandez@westernlaw.org

*Counsel for Plaintiffs*

(List of Counsel continued on next page)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, MONTANA ENVIRONMENTAL INFORMATION CENTER, DAVID KATZ, BONNIE MARTINELL, and JACK MARTINELL, | No. |
| Plaintiffs, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| vs. | |
| U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior; RYAN ZINKE, in his official capacity as Secretary of the United States Department of the Interior; DONATO JUDICE, in his official capacity as Montana Bureau of Land Management Deputy State Director, | |
| Defendants. | |

Kyle J. Tisdel (CO Bar No. 42098)
(*pro hac vice pending*)
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico 87571
Phone: (575) 613-8050
E-mail: tisdel@westernlaw.org

Elizabeth B. Forsyth (California Bar No. 288311)
(*pro hac vice pending*)
Earthjustice
800 Wilshire Blvd., Suite 1000
Los Angeles, CA 90017
Fax: (415) 217-2040
Phone: (415) 217-2000
E-mail: eforsyth@earthjustice.org

*Counsel for Plaintiffs*

## INTRODUCTION

1.      This case challenges the United States Bureau of Land Management's (BLM's) decisions to sell oil and gas leases on public lands in Montana while turning a blind eye to the groundwater contamination and climate pollution that will result from them.

2.      Hydraulically fractured oil and gas development (fracking) in Montana is currently concentrated in the northeastern part of the state near the North Dakota border, in the Bakken Shale formation. BLM's December 2017 and March 2018 lease sales pave the way for the industrial fracking boom to move south and west into other parts of Montana. The lands threatened by the challenged leases include almost 150,000 acres—an area roughly the size of the city of Chicago—including in rural areas that have not yet experienced extensive oil and gas development.

3.      Plaintiffs—a group of public interest organizations, landowners, and Montana residents whose lives and livelihoods depend on clean air and water and a healthy climate—ask this Court to set aside these approvals as violating the National Environmental Policy Act (NEPA) and to void any and all oil and gas leases that were, as a consequence, unlawfully issued. This will ensure that BLM can take a proper hard look at water and climate impacts and consider reasonable alternatives to unbridled oil and gas development.

3

4.     BLM's NEPA analysis is flawed in two ways. First, the agency did not address the reasonably foreseeable impacts of oil and gas drilling on groundwater aquifers or consider measures to ensure that underground sources of drinking water are protected from contamination. This failure disregarded evidence in the record showing that oil and gas companies commonly fail to protect groundwater.

5.     Second, BLM is aware that climate change is happening, has human causes, and has specific impacts in Montana. Nevertheless, BLM did not adequately evaluate the effect of the challenged lease sales on greenhouse gas emissions and resulting climate change impacts, perpetuating the fundamental disconnect between the federal government's management of public lands and the changing climate.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and under the Administrative Procedure Act (APA), 5 U.S.C. §701 *et seq.*, which waives the Defendants' sovereign immunity. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706. There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is located in Montana. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because officers of the United States are named defendants in their official capacities, a substantial part of the events and omissions giving rise to this case occurred in BLM offices located in Montana, and this case involves Montana public lands, resources, and environmental interests. Venue is also proper in this Court because Plaintiffs Montana Environmental Information Center, David Katz, and Jack and Bonnie Martinell reside in Montana. Defendant Donato Judice also resides in this district, and Defendants BLM and the U.S. Department of the Interior maintain offices in this district.

8.    This case should be assigned to the Great Falls Division of this Court because this case challenges oil and gas lease sales in Glacier, Liberty, Hill, Chouteau, Blaine, Phillips, and Valley counties, which are covered by the Great Falls Division. L.R. 1.2(c). BLM's North Central Montana District, Malta, Glasgow, and Havre Field offices are also located in this Division.

## PARTIES

9.    Plaintiff WILDEARTH GUARDIANS (Guardians) is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians has offices in

Colorado, Montana, New Mexico, Arizona, Washington, and Oregon. With more than 200,000 members and supporters, Guardians works to sustain a transition from fossil fuels to clean energy in order to safeguard the West.

10.    Plaintiff MONTANA ENVIRONMENTAL INFORMATION CENTER (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, spiritual, scientific, and professional interests in the responsible production and use of energy; the reduction of greenhouse gas (GHG) pollution as a means to ameliorate our climate crisis; and the land, air, water, and communities impacted by fossil fuel development. MEIC members live, work, and recreate in areas that will be

adversely impacted by approval of the lease sales challenged herein. MEIC brings this action on its own behalf and on behalf of its adversely affected members.

11.   Plaintiff DAVID KATZ is a Montana landowner whose family has owned property on the Stillwater River in Stillwater County for 45 years, close to several of the leases challenged in this complaint. Development on those leases will adversely impact him by jeopardizing usable groundwater and threatening the Stillwater River. Moreover, his property sits on a dirt road that is likely to be affected by dust and road damage from oil and gas development. For example, rockslides have closed the road in the past, and the hundreds or thousands of trips by heavy trucks typically required for modern fracking operations threaten to cause future rockfalls and road closures.

12.   Plaintiffs JACK and BONNIE MARTINELL are owners of a chemical-free orchard in Carbon County, Montana, located in the vicinity of oil and gas leases challenged in this complaint. Past oil and gas drilling in the area has affected their orchard operations, with dust, odors and air pollution from truck traffic disrupting pollination and causing other impacts to the farm. An increase in oil and gas activity from the new leases will further disrupt farm activities, and degrade the Martinells' quality of life. Road access to the new leases goes directly by the Martinells' house, and increased road dust and pollution from oil and gas-related heavy truck traffic will further damage their orchard. Development of the

leases also may threaten usable groundwater underlying their farm. Their farm is irrigated by well water, as well as from a ditch flowing from the Clarks Fork River. The area is semi-arid, and the Martinells anticipate needing to rely on deeper sources of groundwater in the future. Groundwater contamination from drilling authorized by BLM may threaten their current and future sources of drinking water and water used for irrigation of their orchard.

13.    Plaintiffs participated extensively in BLM's administrative process, including commenting on the NEPA analyses for the lease sales and filing administrative appeals (known as "protests") of the lease sales. Plaintiffs have exhausted administrative remedies.

14.    Individual plaintiffs and plaintiff groups' members live, work, farm, and recreate in and around the federal lands at issue in this case. They will be adversely affected and irreparably harmed by the BLM's issuance of the oil and gas leases. Oil and gas development pursuant to the leases will degrade air quality and pollute and consume water resources used and enjoyed by plaintiffs and their members. Oil and gas development will also harm plaintiffs and their members by increasing heavy truck traffic, noise, and light pollution. Plaintiffs and their respective members also have a substantial interest in ensuring that BLM complies with federal law, including the procedural requirements of NEPA. Plaintiffs'

injuries are actual and concrete and would be remedied by the relief sought in this case.

15. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior and is responsible for managing federal public lands and resources, including onshore oil and gas leasing in Montana, and in that capacity is responsible for implementing and complying with federal law.

16. Defendant RYAN ZINKE is sued in his official capacity as the Secretary of the U.S. Department of the Interior. As Secretary, Mr. Zinke is responsible for managing federal public lands and resources, including onshore oil and gas leasing in Montana, and in that capacity is responsible for implementing and complying with federal law.

17. Defendant DONATO JUDICE is sued in his official capacity as the Montana BLM Deputy State Director for Energy, Minerals and Realty. Deputy Director Judice signed the decision records approving the oil and gas lease sale challenged here.

## STATUTORY BACKGROUND

### I. National Environmental Policy Act

18. The National Environmental Policy Act is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

19.    NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare of" all people, and (3) "encourage productive and enjoyable harmony between [hu]man [kind] and [the] environment." 42 U.S.C. § 4321. NEPA recognizes that "each person should enjoy a healthful environment" and ensures that the federal government uses all practicable means to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." *Id.* § 4331(b)-(c).

20.    To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

21.    NEPA requires federal agencies to prepare an environmental impact statement (EIS) for "all major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS process is intended "to

help public officials make decisions that are based on understanding of environmental consequences" and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b)-(c). "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Ctr. for Biological Diversity v. U.S. Forest Serv*., 349 F.3d 1157, 1166 (9th Cir. 2003) (internal citation, quotation marks omitted).

22.    All environmental analyses required by NEPA must be conducted at "the earliest possible time." 40 C.F.R. § 1501.2; *see also Kern v. U.S. Bureau of Land Mgmt.,* 284 F.3d 1062, 1072 (9th Cir.2002) ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done.").

23.    To help determine whether an EIS is necessary, an agency may first prepare an environmental assessment (EA). 40 C.F.R. §§ 1501.3, 1501.4(b)-(c). If the agency determines, after preparing the EA, that the proposed action does not require preparation of an EIS, it must then prepare a finding of no significant impact (FONSI) detailing why the action "will not have a significant effect on the

human environment." 40 C.F.R. §§ 1501.4(e), 1508.13; *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (describing procedure). NEPA's regulations list ten factors that must be considered in determining the significance of an action's environmental effects. 40 C.F.R. § 1508.27(b). These include the degree to which the effects on the environment are "highly controversial," or "highly uncertain or involve unique or unknown risks," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(4)-(5), (7). If the EA indicates that the federal action "may" significantly affect the quality of the human environment, the agency must prepare an EIS. *See, e.g.*, *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2002). In making this determination, BLM must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). "A determination that significant effects on the human environment will in fact occur is not essential. . . . If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982).

24.    As part of its environmental review under NEPA, an agency is required to evaluate the indirect impacts of the proposed action. 40 C.F.R.

§§ 1502.16(b), 1508.8(b), 1508.9(b), 1508.25(c). "Indirect effects" are "caused by the action and are later in time . . . but are still reasonably foreseeable." *Id.* § 1508.8(b).

25.     The agency's NEPA analysis also must assess the cumulative impacts of the action "result[ing] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. §§ 1508.7, 1508.27(b)(7). The cumulative impact analysis "must be more than perfunctory"; it must provide a "useful analysis of the cumulative impacts of past, present, and future projects." *Kern*, 284 F.3d at 1075 (internal citation omitted). Proper consideration of cumulative impacts requires "some quantified or detailed information," and general statements about possible effects "do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 387 F.3d 989, 993-94 (9th Cir. 2004) (internal citation omitted).

26.     The agency must also describe "connected" or "cumulative" actions in a single environmental review. 40 C.F.R. § 1508.25(a); *Klamath-Siskiyou*, 387 F.3d at 999. The purpose of this requirement "is to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006)

(internal quotation marks omitted). Where the proposed actions are "similar," the agency also should assess them in the same document when doing so provides "the best way to assess adequately the combined impacts of similar actions." *Klamath-Siskiyou*, 387 F.3d at 999.

27.     As part of its NEPA review, an agency is also required to prepare a detailed statement regarding the alternatives to a proposed action. *See* 42 U.S.C. § 4332(2)(C)(iii), (E). This analysis of alternatives to the proposed action is the "heart" of NEPA review. 40 C.F.R. § 1502.14; *see also id.* § 1508.9(b). Consideration of reasonable alternatives is necessary to ensure that the agency has taken into account all possible approaches to, and potential environmental impacts of, a particular project. *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). "NEPA's alternatives requirement, therefore, ensures that the most intelligent, optimally beneficial decision will ultimately be made." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (internal quotation marks omitted). An agency must "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir.1985).

## II.     Administrative Procedure Act

28.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

29.     Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)-(F).

## FACTUAL ALLEGATIONS

### I.     The Impact of Oil and Gas Drilling on Underground Drinking Water

30.     Oil and gas drilling involves boring wells to depths thousands of feet below the surface, and often through groundwater aquifers. Without proper well construction, drilling can contaminate underground sources of water. For this reason, proper installation and cementing of metal well casing below the deepest protected water source is critical.

31.     In its Onshore Oil and Gas Order No. 2, BLM directs that oil and gas wells drilled on public lands shall "protect and/or isolate all usable water zones." 53 Fed. Reg. 46,798, 46,808 (Nov. 18, 1988). Onshore Order No. 2 defines "usable water" that must be protected as groundwater containing less than 10,000 parts per

million (ppm) of total dissolved solids. *Id.* at 46,805. This standard is based on the Safe Drinking Water Act definition of an "underground source of drinking water" as an aquifer with water that contains less than 10,000 mg/L (10,000 ppm) of total dissolved solids. 40 C.F.R. §§ 144.3, 146.3. Neither Onshore Oil and Gas Order No. 2 nor other BLM regulations provide specific direction as to how the agency and companies will ensure that well casing and cementing extend deep enough to protect all usable water. Nor do Onshore Order No. 2 or other BLM regulations specifically require testing of underground sources of water to identify all usable water zones before drilling may commence.

32.     Despite the requirements of Onshore Order No. 2, oil and gas companies often do not protect all usable water in practice. Industry trade associations Western Energy Alliance and the Independent Petroleum Association of America (IPAA) have told BLM that "existing practice for locating and protecting usable water" does not comply with the 10,000 ppm standard set by Onshore Order No. 2. The two trade associations explained that actually requiring companies to protect all underground sources of drinking water would result in substantial additional costs for "casing and cementing associated with isolating formations that meet the numerical definition of usable water under the [Onshore Order No. 2 standard], but which are located at depths deeper than the zones that state agencies and BLM field offices have previously designated as requiring

16

isolation." *See* Independent Petroleum Association of America and Western

Energy Alliance Comments on RIN 1004-AE52 at 84, *available at*

https://www.regulations.gov/document?D=BLM-2017-0001-0412 (last visited

May 13, 2018).

33.    Western Energy Alliance and IPAA also have indicated that

companies typically do not measure the numerical quality of water underlying

drilling locations prior to drilling, and therefore do not ensure water containing less

than 10,000 mg/L of dissolved solids would be protected during drilling. *Id.*

34.    A recent sample of existing oil and gas well records in Montana

confirms industry admissions that oil and gas well casing and cementing practices

may not protect usable water. Surface casing for the reviewed wells was generally

shallow, extending only 288-617 feet below ground, even though the wells

themselves extended thousands of feet below ground and through deeper aquifers

containing usable water. The review indicated that all usable water did not appear

to have been protected during construction of these wells as required by Onshore

Order No. 2.

35.    Hydraulic fracturing practices in Montana and other states also may

threaten contamination of usable water. Hydraulic fracturing is an increasingly

common oil and gas drilling technique whereby hydraulic fracturing fluid—a mix

of water, sand, and sometimes toxic chemicals such as formaldehyde—is injected

down an oil or gas production well under pressure great enough to fracture the oil- and gas-bearing rock. After the fracturing, oil, gas, and other fluids flow through the fractures and up the production well to the surface for collection. Today, 90% of the oil and gas wells drilled on federal lands are hydraulically fractured.

36.     A 2016 Environmental Protection Agency (EPA) report reviewed the effect of hydraulic fracturing on groundwater. *See* EPA, Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States (Dec. 2016), *available at* www.epa.gov/hfstudy. EPA's report found that in some areas in Montana there was no vertical separation between the hydraulically fractured rock formation and the bottom of the underground drinking water resource. In other words, hydraulic fracturing is occurring directly into underground drinking water, or immediately adjacent to it. In such cases, EPA concluded that hydraulic fracturing may introduce toxic fracturing fluid into formations that may currently serve, or in the future could serve, as a drinking water source for public or private use.

37.     A recent study of hydraulic fracturing in Pavilion, Wyoming, confirmed that oil and gas drilling had indeed contaminated underground sources of drinking water in that area. The study's authors concluded that given how frequently hydraulic fracturing is employed, contamination of underground sources

of drinking water from oil and gas drilling was unlikely to be limited to the Pavilion area.

## II.    The Impact of Oil and Gas Drilling on Climate Change

38.    Climate change is scientifically established as a real and significant threat to the environment and society. The Intergovernmental Panel on Climate Change warned in *Climate Change 2014 Synthesis Report* (2014), that "[c]ontinued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, including the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems." The U.S. Global Change Research Program repeated this warning in 2017 in its report *Climate Science Special Report: Fourth National Climate Assessment, Volume I* (2017): "There is broad consensus that the further and the faster the Earth system is pushed towards warming, the greater the risk of unanticipated changes and impacts, some of which are potentially large and irreversible."

39.    The Secretary of the Interior stated, in Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning* (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Order 3226 established the responsibility of agencies to "consider and analyze potential climate change impacts when undertaking long-range planning

exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or *when making major decisions regarding potential utilization of resources under the Department's purview*." (emphasis added).

40.    The U.S. Government Accountability Office, in a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources*, concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

41.    Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009), reinstated the provisions of Order 3226; recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee"; and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change."

42.    There remains a fundamental disconnect with regard to climate change and its resulting impacts and how our public lands are managed for energy production, particularly in the West. BLM cannot take informed action to address

20

climate change, as required by Order 3226 and Order 3289, without taking a hard look at the climate impacts of oil and gas development on our public lands. As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "[m]anagement decisions made in response to climate change impacts must be informed by [this] science."

### III.    The Process of Oil and Gas Leasing on Public Land

43.    Under the Mineral Leasing Act and Federal Land Policy and Management Act, BLM manages oil and gas drilling on public lands using a three-stage process. *New Mexico ex rel. Richardson v. U.S. Bureau of Land Mgmt.*, 565 F.3d 683, 689 n. 1 (10th Cir. 2009).

44.    In the first phase, BLM prepares a Resource Management Plan (RMP) pursuant to 43 U.S.C. § 1712 and 43 C.F.R. Part 1600. RMPs operate like zoning plans that generally define the allowable uses of the public lands in the planning area. At the RMP stage, BLM determines generally what areas to make available for oil and gas leasing and under what conditions. An RMP does not require leasing any specific lands. BLM typically prepares an EIS evaluating, in general terms, the expected environmental impact of potential land management decisions made in RMPs, including oil and gas development.

45.     In the second phase, companies typically nominate oil and gas leaseholds for sale through submission of "expressions of interest." BLM then decides whether to offer those lands for sale and proceeds to sell leases for those lands, in accordance with 43 C.F.R. Part 3120. Prior to sale, BLM typically prepares an environmental review evaluating the environmental impact of the lease sale. BLM may also subject leases to terms and conditions—"stipulations" or "lease notices"—to protect the environment.

46.     In the third and final phase, which occurs after lease sale and issuance, the lessee submits an application for a permit to drill (APD) to BLM prior to drilling. 43 C.F.R. § 3162.3-1(c).

47.     The leasing stage represents a critical step because issuance of a lease generally gives the lessee a right to use some of the land for oil and gas development. *Conner v. Burford*, 848 F.2d 1441, 1449-50 (9th Cir. 1988); *Sierra Club v. Peterson,* 717 F.2d 1409, 1414-15 (D.C. Cir. 1983). Typically, a lease represents an irreversible commitment of resources by committing the leased land and/or federally-owned minerals, to development. *Conner*, 848 F.2d at 1446, 1449-50. Issuing such leases limits BLM's ability to require additional protective measures in the future, or to forego oil and gas development altogether on the leased land. *Id.* at 1449-50. For that reason, a full NEPA analysis is necessary prior

to issuing a lease in order to address reasonably foreseeable impacts from development on that lease. *Id.*

48.     Leases that are sold are issued for a primary term of 10 years with a minimum rental bid of $2/acre. 43 C.F.R. §§ 3120.1-2(c), 3120.2-1. Once a lease is producing oil or gas, the operator may hold it indefinitely, until it is abandoned.

49.     Some lease parcels never see development. According to BLM, at the end of Fiscal Year 2016, of the 2,101,573 million acres of federal oil and gas under lease in Montana, only 710,617 acres are in production.

## PROCEDURAL HISTORY

### I.     December Lease Sales

50.     In December 2017, BLM offered 204 Montana lease parcels for sale, covering 98,889 acres located in Big Horn, Custer, Carter, Fallon, Garfield, Powder River, Richland, and Rosebud counties.

51.     BLM prepared an Environmental Assessment for the lease sale.

52.     The EA did not evaluate the potential for leasing to cause site-specific impacts, including impacts on groundwater, instead deferring this analysis to the APD stage.

53.     The EA acknowledged that climate change is happening and is caused by human activities. BLM also acknowledged that fossil fuel development contributes to climate change through emissions of greenhouse gases (especially

carbon dioxide and methane) from development activities and combustion. The lease sale EA also acknowledged that climate change is having impacts in Montana, including warmer temperatures with less snowfall, earlier snowmelt, earlier peak stream flow, and more severe and frequent droughts.

54. The December 2017 Lease Sale EA, however, failed to address the reasonably foreseeable climate change impacts resulting from the lease sale itself, as required by NEPA. The EA entirely failed to quantify cumulative emissions from other proposed lease sales in Montana and surrounding Western states; failed to accurately quantify direct and indirect emissions from oil and gas development; failed to monetize the economic costs of GHG emissions from the lease sales, despite monetizing and trumpeting the economic benefits of the lease sales; and failed to provide any measure to demonstrate the context and intensity of the GHG emissions from the lease sales. Without that information, it was impossible for the public or BLM decision-makers to compare the costs and benefits of selling the leases, or to make informed choices between alternative courses of action.

55. The December 2017 Lease Sale EA tiered to (i.e, relied on) the Miles City Resource Management Plan for its discussion of climate change. The Miles City RMP analysis, however, is outdated. The Miles City RMP analysis fails to adequately quantify and analyze greenhouse gas emissions and resulting climate change impacts for the parcels at issue in the December 2017 Lease Sale EA.

## II.    March Lease Sales

56.    In March 2018, BLM offered 83 leases for sale in Montana, covering 46,174 acres. The agency segmented its NEPA analysis for the sale into three separate documents:

(i)  An EA for BLM's North Central Montana District Office, which covered lease parcels in Glacier, Liberty, Hill, Chouteau, Blaine, Phillips, and Valley counties;

(ii)  An EA for BLM's Billings Field Office, which covered lease parcels in Musselshell, Sweet Grass, Stillwater, Golden Valley, Wheatland, and Carbon counties; and

(iii)   An EA for BLM's Butte Field Office, covering parcels in Park County.

57.    The EAs attempted to tier to (rely on) the Billings Resource Management Plan and the Butte Resource Management Plan for NEPA compliance. The Billings and Butte RMP analyses, however, are outdated. The Billings and Butte RMP analyses fail to adequately quantify and analyze greenhouse gas emissions and resulting climate change impacts for the parcels at issue in the March 2018 Lease Sale EAs.

58.    Despite substantial evidence to the contrary, the EAs assumed that "wells would be cased and cemented to depths below accessible freshwater zones,"

that groundwater would therefore be protected, and that there would be no impacts on water resources from the lease sales. The EAs made no attempt to evaluate the depth of usable groundwater under the leases, the extent to which oil and gas drilling had already contaminated underground sources of drinking water, the potential for the proposed lease sales to further impact drinking water, and what reasonable alternatives might be available to mitigate impacts to drinking water. Instead, BLM deferred any meaningful analysis of groundwater impacts until a later stage when it approves drilling permits, even though this analysis and groundwater testing is not typically done at the drilling permit stage. None of the leases contained any sort of stipulation or other requirements mandating installation of protective casing to a specific depth to prevent contamination of usable groundwater, or any requirement that oil and gas operators test for usable water before drilling.

59.     Although BLM acknowledges that climate change is happening, has human causes, and has specific impacts in Montana, the EAs failed to address the reasonably foreseeable climate change impacts resulting from the lease sale, as required by NEPA. The EAs entirely failed to quantify cumulative emissions on a regional or national scale, failed to accurately quantify direct and indirect emissions from oil and gas development, and failed to provide any measure to demonstrate the context and intensity of those emissions. That missing information

prevented BLM and the public from comparing the costs and benefits of selling the leases, or making informed choices between alternatives.

60.    The reasonably foreseeable oil and gas drilling on the leases will have a cumulatively significant impact on the environment, including contamination of rivers, streams and groundwater, and contributing to climate change. But instead of evaluating these leases in a single EIS, BLM segmented its review into three EAs that do not even reference each other, even though some of the leases evaluated in separate EAs are adjacent to each other and would drill from the same oil and gas formation. BLM concluded in each of the separate EAs that impacts from oil and gas drilling would be insignificant.

61.    In addition to the March Montana sale, BLM has sold, and has proposed to sell, hundreds of thousands of acres of other oil and gas leases in Montana, North Dakota, Colorado, Wyoming and other western states. These sales together will have significant cumulative environmental impacts, including on water quality and climate change. None of the three EAs for the Montana lease sales, however, provided "quantified or detailed information" evaluating the cumulative impacts of these sales or from other reasonably foreseeable actions cumulatively affecting people and the environment. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993.

62.     Despite NEPA's instruction to "rigorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), each of the EAs evaluated only two alternatives: the proposed action to lease all parcels, and a no action alternative to exclude all parcels. The EAs neglected to evaluate reasonable alternatives that would have avoided significant impacts to water quality and climate. These include, for example, declining to lease lands in areas near sensitive water resources, adding additional stipulations to protect groundwater, deferring leasing of some parcels, or deferring leasing of all parcels until most existing federal oil and gas leases in Montana are put into production.

63.     Plaintiffs now bring this challenge to ensure BLM takes a hard look at the impacts of the oil and gas activity it is authorizing, and consider reasonable alternatives. Specifically, Plaintiffs challenge the environmental assessments for the Oil and Gas Lease Parcel December 11 and 12, 2017 Sale (dated September 14, 2017) and March 13, 2018 sale (dated December 13, 2017); the associated findings of no significant impact (dated December 8, 2017 and March 9, 2018); the associated decision records (dated December 8, 2017 and March 9, 2018); the decisions to dismiss Plaintiffs' protests of the lease sales (dated November 27, 2017, February 21, 2018, February 22, 2018, March 1, 2018, March 6, 2018, March 7, 2018); and the subsequent issuance of any associated leases.

## FIRST CAUSE OF ACTION
## FAILURE TO TAKE A HARD LOOK
### (Violation of NEPA)

64.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

65.     NEPA requires BLM to take a "hard look" at all reasonably foreseeable environmental impacts and adverse effects of the proposed lease sales. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.

66.     BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the lease sales on groundwater.

67.     BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the lease sales on climate change and failed to provide any measure to demonstrate the context and intensity of the emissions directly and indirectly caused by the proposed leases.

68.     BLM trumpeted the economic benefits of its agency actions without also acknowledging the economic costs of those actions. Specifically, BLM failed to monetize the economic costs of GHG emissions from the lease sales, despite monetizing and trumpeting the economic benefits of the lease sales.

69.     BLM unlawfully avoided analyzing significant oil and gas impacts by relying on inadequate past analysis—at the Resource Management Plan stage—and speculative promises of future analysis—at the Application for Permit to Drill

stage—to avoid analysis of its current leasing decisions. This approach violated NEPA, which requires BLM to analyze and disclose all reasonably foreseeable impacts not only at the RMP and drilling permit stages, but also before it makes an irreversible commitment of resources by issuing oil and gas leases.

## SECOND CAUSE OF ACTION
## FAILURE TO ANALYZE CUMULATIVE IMPACTS
### (Violation of NEPA)

70.   All preceding paragraphs are hereby incorporated as if fully set forth herein.

71.   Pursuant to NEPA, BLM must analyze "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

72.   BLM has sold, and proposes to sell, hundreds of thousands of acres of oil and gas leases in Montana, and in the neighboring states of North Dakota, Colorado, and Wyoming, but has unlawfully failed to analyze the cumulative impact of these sales.

## THIRD CAUSE OF ACTION
## FAILURE TO PREPARE AN EIS
### (Violation of NEPA)

73.   All preceding paragraphs are hereby incorporated as if fully set forth herein.

74.     Under 40 C.F.R. § 1508.25(a)(1), (2), two or more agency actions must be discussed in the same EIS where they are "connected" or "cumulative" actions. Where the proposed actions are "similar," the agency "may wish" to assess them in the same document and "should do so" when a single document provides "the best way to assess adequately the combined impacts of similar actions." 40 C.F.R. § 1508.25(a)(3).

75.     BLM's sales of oil and gas leases, taken together, have cumulatively significant impacts on the environment, including but not limited to impacts on groundwater quality and climate change. But rather than evaluating the cumulative impacts of lease sales on the environment in a single EIS, BLM unlawfully segmented its review into multiple EAs which failed to evaluate the cumulative impact of the sales.

76.     NEPA requires federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's regulations list ten factors that must be considered in determining the significance of an action's environmental effects. 40 C.F.R. § 1508.27(b). These include, for example, the degree to which the effects on the environment are "highly controversial," "highly uncertain or involve unique or unknown risks," and "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.*

31

§ 1508.27(b)(4)-(5), (7). An EIS must also be prepared to examine actions constituting an "irreversible and irretrievable commitment of resources." *Conner*, 848 F.2d at 1446.

77.     The BLM's lease sales, taken together, are an irretrievable commitment of resources, highly controversial, likely to involve unique or unknown risks on water quality, and pose cumulatively significant impacts on the environment. They are therefore a major federal action significantly affecting the quality of the human environment, and BLM violated NEPA by failing to prepare an EIS.

<u>FOURTH CAUSE OF ACTION</u>
**FAILURE TO CONSIDER REASONABLE ALTERNATIVES**
**(Violation of NEPA)**

78.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

79.     Pursuant to NEPA, BLM must consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14. BLM's duty to consider reasonable alternatives is operative even when impacts are not deemed significant; BLM must also consider reasonable alternatives "in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). "The existence of a viable but unexamined

alternative renders an environmental impact statement inadequate." *Citizens for a Better Henderson*, 768 F.2d at 1057.

80.     Groundwater contamination caused by hydraulic fracturing as well as climate pollution caused by the production of oil and gas resources constitute unresolved conflicts concerning alternative uses of groundwater and subsurface mineral resources.

81.     By evaluating only the proposed action and a no action alternative, BLM failed to consider reasonable and viable alternatives to the lease sales, including alternatives that would have prevented or minimized the impacts of oil and gas leasing on groundwater quality, climate change, and other resource values.

## **REQUEST FOR RELIEF**

THEREFORE, Plaintiffs respectfully request that this Court:

A. Issue a declaratory judgment that Defendants violated NEPA in approving the lease sales;

B. Issue an order setting aside as unlawful the decision records approving the lease sales, the underlying EAs and FONSIs, the protest decisions, and all leases issued pursuant to such sales;

C. Award Plaintiffs the costs of this action, including reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

D. Retain continuing jurisdiction over this matter until Defendants remedy the violations of law identified herein; and

E. Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

DATED this 15th day of May, 2018.


/s/ Laura King_____
/s/ Shiloh Hernandez_____
Laura H. King (MT Bar No. 13574)
Shiloh S. Hernandez (MT Bar No. 9970)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone (LK): (406) 204-4852
Phone (SH): (406) 204-4861
E-mail: king@westernlaw.org
E-mail: hernandez@westernlaw.org

Kyle J. Tisdel (CO Bar No. 42098)
(*pro hac vice pending*)
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico 87571
Phone: (575) 613-8050
E-mail: tisdel@westernlaw.org

Elizabeth B. Forsyth (CA Bar No. 288311)
(*pro hac vice pending*)
Earthjustice
800 Wilshire Blvd., Suite 1000
Los Angeles, CA 90017
Fax: (415) 217-2040
Phone: (415) 217-2000
E-mail: eforsyth@earthjustice.org