JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
REBECCA JAFFE (NC Bar No. 40726)
Trial Attorney
     601 D St. NW, 3rd Floor
     Washington, D.C. 20004
     Tel: (202) 305-0258
     Fax: (202) 305-0506
     rebecca.jaffe@usdoj.gov

Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| WILDEARTH GUARDIANS, *et al.*,<br><br>          Plaintiffs,<br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>          Defendants. | CV 4:18-CV-00073-BMM<br><br>**Defendants' Cross-Motion for Summary Judgment** |

Defendants United States Bureau of Land Management; David Bernhardt, Acting Secretary of the United States Department of the Interior; and Donato Judice, Montana Bureau of Land Management Deputy State Director, respectfully move the Court to enter summary judgment in favor of Defendants, deny Plaintiffs' motion for summary judgment, ECF No. 25, and dismiss the case with prejudice. This motion is based upon Federal Rule of Civil Procedure 56 and is

supported by the attached memorandum of points and authorities and the

administrative record lodged with the Court, ECF Nos. 21 & 22.

Respectfully submitted,

Dated:  April 8, 2019                    JEAN E. WILLIAMS
                                         Deputy Assistant Attorney General

                                         /s/ Rebecca Jaffe
                                         REBECCA JAFFE
                                         Trial Attorney
                                         Attorney for Defendants

ii

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
REBECCA JAFFE (NC Bar No. 40726)
Trial Attorney
     601 D St. NW, 3rd Floor
     Washington, D.C. 20004
     Tel: (202) 305-0258
     Fax: (202) 305-0506
     rebecca.jaffe@usdoj.gov

Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| WILDEARTH GUARDIANS, *et al*., | CV 4:18-CV-00073-BMM |
| Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT, *et al.*, <br><br> Defendants. | **Defendants' Opposition to Plaintiffs' Motion for Summary Judgment & Memorandum in Support of Cross-Motion for Summary Judgment** |

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

TABLE OF ABBREVIATIONS ...................................................................... vii

I.    INTRODUCTION ................................................................................ 1

II.   STATUTORY BACKGROUND ........................................................ 1

   A.  Oil and Gas Leasing on Federal Lands ........................................ 1

   B.  National Environmental Policy Act ............................................. 3

III.  FACTUAL BACKGROUND ............................................................. 5

IV.   STANDARD OF REVIEW ................................................................ 7

V.    ARGUMENT ...................................................................................... 8

   A.  BLM Thoroughly Considered Climate Change ............................ 8

     1. Quantitative Analysis of GHG Emissions ............................... 9

     2. Narrative Explanation of Climate Change and Cumulative Impacts of GHG Emissions ................................................................................. 15

   B.  BLM Took a "Hard Look" at Water Impacts ............................. 18

     1. Impacts to Water Quality and Quantity ................................. 18

     2. Additional Analysis at the APD Stage ................................... 22

   C.  BLM Considered Cumulative Effects ......................................... 26

   D.  BLM Did Not Need to Prepare an EIS ........................................ 30

   E.  BLM's Alternatives Analysis Was Sufficient ............................ 34

VI.   REMEDY .......................................................................................... 37

VII.  CONCLUSION ................................................................................. 38

# TABLE OF AUTHORITIES

## Cases

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
 988 F.2d 146 (D.C. Cir. 1993) ............................................................38

*Amigos Bravos v. BLM*,
 No. 6:09-CV-00037-RB-LFG, 2011 WL 7701433 (D.N.M. Aug. 3, 2011)..........5

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
 462 U.S. 87 (1983) ................................................................30

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
 524 F.3d 938 (9th Cir. 2008)................................................35

*Blue Mountains Diversity Project v. Blackwood*,
 161 F.3d 1208 (9th Cir. 1998).............................................32

*Cal. Cmtys. Against Toxics v. EPA*,
 688 F.3d 989 (9th Cir. 2012)................................................38

*California v. Block*,
 690 F.2d 753 (9th Cir. 1982)................................................23

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
 449 F.2d 1109 (D.C. Cir. 1971) ............................................28

*Citizens for a Healthy Cmty. v. BLM*,
 No. 1:17-CV-02519-LTB-GPG, 2019 WL 1382785 (D. Colo. Mar. 27, 2019)..22

*Colo. Envtl. Coal. v. Salazar*,
 875 F. Supp. 2d 1233 (D. Colo. 2012) ................................35

*Conner v. Burford*,
 848 F.2d 1441 (9th Cir. 1988)........................................ 30, 31, 32, 33

*Ctr. for Biological Diversity v. BLM*,
 No. 3:17-CV-553-LRH-WGC, 2019 WL 236727 (D. Nev. Jan. 15, 2019). 24, 26, 31

*Earth Island Inst. v. U.S. Forest Serv.*,
 697 F.3d 1010 (9th Cir. 2012)..............................................8

*Envtl. Def. Fund, Inc. v. Corps of Eng'rs*,
 325 F. Supp. 749 (E.D. Ark. 1971) ....................................28

*Friends of Yosemite Valley v. Norton*,
    348 F.3d 789 (9th Cir. 2003) ................................................................23

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
    860 F.3d 1244 (9th Cir. 2017) .............................................................28

*Idaho Wool Growers Ass'n v. Vilsack*,
    816 F.3d 1095 (9th Cir. 2016) .............................................................15

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
    42 F.3d 517 (9th Cir. 1994) .................................................................17

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ................................................................8

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest
    Serv.*,
     (9th Cir. 2008) .................................................................................27

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ...........................................................................33

*Mont. Wilderness Ass'n v. Fry*,
    310 F. Supp. 2d 1127 (D. Mont. 2004) ...............................................33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................7, 8

*N. Alaska Envtl. Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ...........................................................3, 23

*N. Plains Res. Council v. BLM*,
    298 F. Supp. 2d 1017 (D. Mont. 2003) ...............................................31

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ...............................................................38

*New Mexico ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009) ...................................................... 22, 32

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...............................................................................2

*Or. Nat. Desert Ass'n v. BLM*,
    625 F.3d 1092 (9th Cir. 2010) .............................................................36

*Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric.*,
   817 F.2d 609 (10th Cir. 1987).................................................................2

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ..............................................................................3

*San Juan Citizens All. v. BLM*,
   326 F. Supp. 3d 1227 (D.N.M. 2018).................................................29

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013)..............................................38

*United States v. Alpine Land & Reservoir Co.*,
   887 F.2d 207 (9th Cir. 1989) ................................................................8

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) ..............................................................................36

*Vill. of Los Ranchos De Albuquerque v. Marsh*,
   956 F.2d 970 (10th Cir. 1992)...............................................................2

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978) ............................................................................36

*W. Org. of Res. Councils v. BLM*,
   No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26, 2018) .. 6, 9, 29

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ................................................................3

*WildEarth Guardians v. BLM*,
   8 F. Supp. 3d 17 (D.D.C. 2014) .........................................................13

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ...........................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................8

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................7

30 U.S.C. § 181 ............................................................................................2

30 U.S.C. § 226(b)(1)(A) .............................................................................2

42 U.S.C. § 4321 ..........................................................................................3

43 U.S.C. § 1712(a) ...................................................................................2

43 U.S.C. § 1712(e) ...................................................................................2

43 U.S.C. § 1732(a) ...................................................................................1

**Regulations**

40 C.F.R. § 1501.1 ....................................................................................3

40 C.F.R. § 1502.20 ........................................................................... 4, 5, 29

40 C.F.R. § 1506.4 ....................................................................................4

40 C.F.R. § 1508.11 ..................................................................................4

40 C.F.R. § 1508.27(a) ............................................................................34

40 C.F.R. § 1508.27(b) ............................................................................34

40 C.F.R. § 1508.7 ........................................................................... 26, 27

40 C.F.R. § 1508.9 ..................................................................................32

40 C.F.R. § 1508.9(a)(1) ...........................................................................4

43 C.F.R. § 3101.1-2 .................................................................................3

43 C.F.R. § 3120.1-1 .................................................................................2

43 C.F.R. § 3162.3-1(c) ............................................................................3

43 C.F.R. § 3162.3-1(h) ..........................................................................25

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| APD | Application for Permit to Drill |
| BLM | Bureau of Land Management |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| GHG | Greenhouse Gas |
| NEPA | National Environmental Policy Act |
| NSO | No-Surface Occupancy |
| RFDS | Reasonably Foreseeable Development Scenario |
| RMP | Resource Management Plan |

## I.   <u>INTRODUCTION</u>

Defendants the United States Bureau of Land Management ("BLM"); David Bernhardt, Acting Secretary of the Department of the Interior; and Donato Judice, Montana BLM Deputy State Director, are entitled to summary judgment because the BLM thoroughly analyzed environmental impacts from its December 2017 and March 2018 oil and gas lease sales.  BLM considered climate change through narrative discussions and quantitative predictions of greenhouse gas ("GHG") emissions.  It also assessed impacts to water quality and quantity, including potential negative impacts such as contamination and diminished water supplies. BLM satisfied the National Environmental Policy Act's ("NEPA") mandates to ensure informed decisionmaking and to provide relevant information to the public. The Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment, ECF No. 25.

## II.   <u>STATUTORY BACKGROUND</u>

### A. <u>Oil and Gas Leasing on Federal Lands</u>

BLM manages federal lands "under principles of multiple use and sustained yield."  43 U.S.C. § 1732(a).  "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to,

1

recreation, range, timber, minerals, watershed, wildlife and fish . . . .'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)). Congress has expressly and unquestionably provided for development of oil and gas resources on public lands. *See* 30 U.S.C. § 181. As the Tenth Circuit has explained, "[i]t is the stated public policy of the United States to make public lands, including national forest land, available for mineral leasing in an effort to reduce our energy dependence on foreign sources and to protect our national security." *Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 620 (10th Cir. 1987), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

The Mineral Leasing Act provides for development of oil and gas resources on public lands and requires quarterly lease sales in response to public expressions of interest. 30 U.S.C. § 226(b)(1)(A), 43 C.F.R. § 3120.1-1.

Generally, oil and gas development on federal lands involves three steps. First, BLM develops an area-wide resource management plan ("RMP"), specifying which areas will be open to development and the conditions placed on such development. 43 U.S.C. § 1712(a). Second, BLM may grant leases for the development of specific sites within an area that is open to leasing, subject to the requirements of the RMP. 43 U.S.C. § 1712(e). Finally, a lessee may file an application for permit to drill ("APD"), which requires BLM review and approval.

43 C.F.R. § 3162.3-1(c). BLM may condition APD approval on the lessee's adoption of "reasonable measures," delimited by the lease and the lessee's surface use rights, to mitigate the drilling's environmental impacts. 43 C.F.R. § 3101.1-2. "NEPA applies at all stages of the process." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006).

### B. <u>National Environmental Policy Act</u>

NEPA serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The statute achieves its objectives by imposing procedural rather than substantive requirements. *Robertson*, 490 U.S. at 351 (NEPA "prohibits uninformed—rather than unwise—agency action."). Thus, NEPA does not require an agency to follow the most environmentally sound course of action, but rather to take a "hard look" at the environmental consequences of proposed actions. *Id.* at 350. "A court must avoid passing judgment on the substance of an agency's decision"; instead, its "focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quoting *Robertson*, 490 U.S. at 350).

3

The NEPA process for oil and gas development generally involves preparing two types of documents: environmental impact statements ("EIS"), which are detailed written statements describing significant effects on the human environment, 40 C.F.R. § 1508.11, and environmental assessments ("EA"), which are "concise" documents that "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact," 40 C.F.R. § 1508.9(a)(1).

In a multi-step process, such as the federal oil and gas leasing regime, NEPA regulations "encourage[]" agencies "to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."  40 C.F.R. § 1502.20.  In other words, "[a]ny environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork."  40 C.F.R. § 1506.4.  NEPA regulations provide that, whenever a broad EIS has been prepared (as occurs in the resource management planning process) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program (such as site-specific leasing), "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the

subsequent action." 40 C.F.R. § 1502.20. This tiering process "is a common practice in the oil and gas context." *Amigos Bravos v. BLM*, No. 6:09-CV-00037-RB-LFG, 2011 WL 7701433, at *15 (D.N.M. Aug. 3, 2011).

## III.   FACTUAL BACKGROUND

In December 2017 and March 2018, BLM Montana held sales in four planning areas, HiLine, Billings, Butte, and Miles City, offering parcels that had been nominated by the public for oil and gas leasing. BLM-MT-MC-000002, BLM-MT-BI-000004, BLM-MT-BU-000001, BLM-MT-HI-000001, BLM-MT-HI-000019. Each lease sale was supported by a Finding of No Significant Impact ("FONSI") and an EA, which had been made available to the public in draft form, along with appendices. *E.g.*, BLM-MT-MC-000005, BLM-MT-MC-003523–33, BLM-MT-MC-002477–820, BLM-MT-MC-003836–39, BLM-MT-MC-003472–522. Each EA examined two alternatives: no action, i.e., excluding all parcels from the lease sale, and the proposed action, i.e., offering the nominated parcels for sale. BLM-MT-BI-000011–12, BLM-MT-BU-000002, BLM-MT-HI-000002, BLM-MT-MC-000002. All of the lease sales tiered to the relevant RMP and accompanying EIS. BLM-MT-BI-000003, BLM-MT-BU-000014, BLM-MT-HI-000009, BLM-MT-MC-002483.[1]

---

[1] This Court held that BLM must supplement the Miles City Final EIS with an analysis of the environmental consequences of downstream combustion of coal, oil, and gas open to development and ordered that any new or pending leases of oil

For Billings, BLM decided to defer, i.e., withhold from the lease sale, 23 parcels plus portions of two others because of public comments raising concerns about potential environmental impacts, and offer for lease 51 parcels plus portions of two others.  BLM-MT-BI-004709, BLM-MT-BI-000001.  For Butte, BLM offered six parcels and deferred three parcels due to potential environmental impacts.  BLM-MT-BU-000001.  BLM offered 24 HiLine parcels for lease.  BLM-MT-HI-000001.  And BLM offered 204 parcels for lease in the Miles City area. BLM-MT-MC-000002.

BLM approved the lease sales because the sales were consistent with the relevant RMPs, national policy, and statutory requirements and because the lease sales all incorporated stipulations that will avoid or minimize environmental impacts.  BLM-MT-BI-000003, BLM-MT-BU-000002, BLM-MT-HI-000002, BLM-MT-MC-000003.  The EAs all identified stipulations and lease notices that would avoid or minimize impacts to resources and that would be incorporated into any future oil and gas development.  BLM-MT-BI-000013, BLM-MT-MC-000006, BLM-MT-BU-000012, BLM-MT-HI-000007.  For example, the Billings,

---

or gas resources in the Miles City planning area must analyze downstream combustion.  *W. Org. of Res. Councils v. BLM* ("*WORC*"), No. CV 16-21-GF-BMM, 2018 WL 1475470, at *19 (D. Mont. Mar. 26, 2018).  The WORC decision post-dated all of the EAs and lease sales, but each leasing EA included a downstream combustion analysis, including the Miles City EA.

HiLine, and Miles City leases had a stipulation requiring diesel engines used for drilling activities to comply with certain emissions standards.  BLM-MT-BI-000354, BLM-MT-HI-000042, BLM-MT-MC-002729.  All the leases also had stipulations protecting riparian areas, streams, waterbodies, and flood plains.  *E.g.*, BLM-MT-BI-004772.

Plaintiffs filed this action challenging the lease sales and arguing that BLM did not satisfy NEPA.  ECF No. 1.  Plaintiffs moved for summary judgment, ECF No. 25, and the United States now submits this combined brief in support of its motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment.

## IV.   <u>STANDARD OF REVIEW</u>

NEPA lacks a private right of action or waiver of sovereign immunity, so courts review such claims under the Administrative Procedure Act, which provides that a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under this standard "is narrow, and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency's decision can be set aside "*only* if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation

that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

To prevail, an agency need only articulate a "rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43. "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters." *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989).

## V.   <u>ARGUMENT</u>

BLM thoroughly analyzed potential environmental impacts from the lease sales. While the lease sales themselves do not cause surface disturbance or oil and gas development, *e.g.*, BLM-MT-MC-002520, BLM-MT-BI-000015, BLM analyzed impacts that may occur in the future if the lease parcels are developed.

### A. <u>BLM Thoroughly Considered Climate Change</u>

BLM provided both narrative and quantitative analyses of climate change, thus providing both the decisionmaker and the public explanations and data based on reasonable assumptions. NEPA demands nothing more.

### 1. *Quantitative Analysis of GHG Emissions*

BLM based its quantitative analysis of climate change on GHG emission estimates, and its "selection of GHG emissions as a proxy by which to analyze climate change impacts represents a scientific judgment deserving of deference." *WORC*, 2018 WL 1475470, at *18.

BLM's quantitative analysis was based on reasonably foreseeable development scenarios ("RFDS")—which project the scope and pace of oil and gas development on both federal and non-federal lands within the planning areas over the next 20 years.  BLM-MT-BI-010646.  The RFDSs are based on historical drilling patterns, geologic data, BLM's resource expertise, and current development.  BLM-MT-BI-004741.

In the Billings planning area, BLM predicted two to four new federal conventional oil and gas wells would be drilled per year, with a total of up to 80 new federal wells drilled over a 20-year period.[2]  BLM-MT-BI-002320.  BLM did not predict any new coalbed methane natural gas wells in Billings. BLM-MT-BI-002320.  For Butte, BLM predicted a total of 19 oil and gas wells over 20 years, of

---

[2] In the last 10 years, there have been only nine APDs approved within the Billings area and, therefore, the Billings RFDS is most likely an over estimate of drilling potential.  BLM-MT-BI-000345.

which 13 would likely be dry, i.e., lacking recoverable oil or gas.[3]  BLM-MT-BU-000807, BLM-MT-BU-001631.  Each of the six producing wells would likely lead to two additional wells, thus creating a total of 31 oil and gas wells in the Butte area.  BLM-MT-BU-000807.  BLM predicted that one of the producing wells would be on federal lands, either BLM or United States Forest Service lands.  BLM-MT-BU-000807.  BLM also predicted up to 40 coalbed natural gas wells in Butte, none of which would be federal.  BLM-MT-BU-000807.

For HiLine, BLM predicted as many as 5,908 wells would be drilled over 20 years, including 1,768 federal wells.  BLM-MT-HI-001321.  BLM predicted 1.49 new producing oil wells and between 38 and 103 new producing gas wells on federal lands per year for HiLine, for a total of 30 new producing federal oil wells and 1,427 new producing federal gas wells over 20 years.  BLM-MT-HI-002141.  For Miles City, BLM predicted an annual average of 25.58 new producing federal coalbed methane natural gas wells, 18.42 new producing federal gas wells and 21.95 new producing federal oil wells over a 20-year period.  BLM-MT-MC-001652.  BLM also predicted and average of 1.05 dry federal coalbed natural gas

---

[3] In the last 10 years, BLM's Butte office has not approved any APDs. BLM-MT-BI-004741.  The county where the Butte leases are located had only 33 wells drilled between 1914 and 2008, all of which have been plugged and abandoned.  BLM-MT-BU-000029.  The RFDS for Butte is most likely an over estimate of drilling potential.  BLM-MT-BU-000029, BLM-MT-BI-004741.

wells, 4.84 dry federal gas wells, and 6.21 dry federal oil wells annually in Miles City.  BLM-MT-MC-001652.  These rigorous predictions provided the basis for BLM's GHG calculations.

BLM calculated direct GHG emissions[4] from oil and gas production, such as drill rig engines, dehydrators, leaks, pumps, compressors, and vehicle exhaust. BLM-MT-BI-010693–95.  BLM noted that, at the leasing stage, the amount of GHG emissions is only a projection because BLM does not yet know specific details, such as the type of well, the drilling method, the specific equipment that will be used, and the scope of construction for roads, well pads, and onsite treatment and storage.  *E.g.*, BLM-MT-BI-000053, BLM-MT-HI-000041–42, BLM-MT-MC-002522.  And GHGs might be emitted from venting, flaring, and equipment leaks.  BLM-MT-BI-000053.  Nonetheless, after acknowledging these variables, BLM predicted the annual emissions for the year of highest expected total emissions, including construction and production.  *E.g.*, BLM-MT-BI-010696.  For year 2030, BLM predicted a total of 22,105.1 tons[5] of GHG

---

[4] There are different GHGs, such as carbon dioxide, methane, or nitrous oxide, and all of them have a different impact on global warming based on their heat trapping effects and longevity in the atmosphere.  BLM-MT-BI-010587.  BLM calculated GHG emissions as carbon dioxide equivalents in order to quantify the cumulative effects of different types of GHG emissions.  BLM-MT-BI-010587.

[5] All references to "tons" are "metric tons."

emissions, including 9,040.6 tons of federal emissions, from production in the Billings area.  BLM-MT-BI-010696.  In the Butte area, BLM predicted a total of 5,424 tons of GHG emissions, including 560.8 tons of federal emissions, for the year 2028.  BLM-MT-BU-005371.  For HiLine, BLM predicted a total of 410,610.9 tons of GHG emissions, including 133,856.7 tons of federal emissions, for the year 2026.  BLM-MT-HI-006679.  For Miles City, BLM predicted a total of 1,993,630.8 tons of GHG emissions, including 610,741.1 tons of federal emissions, for the year 2028.  BLM-MT-MC-004874.

BLM then calculated the indirect emissions from combustion of oil and gas produced from the lease sales.  Again, as with the direct GHG emissions from production, BLM projected the highest possible emissions, assuming 100 percent combustion of oil and gas produced from the lease sales, even though uses of oil and gas may vary.  BLM-MT-BI-004833, BLM-MT-BU-000048, BLM-MT-HI-000043, BLM-MT-MC-002523.  For Billings, BLM projected an increase of 0.0036 million tons per year of GHGs if the leases were developed and if the number of wells projected produce oil and gas at rates similar to other wells in the associated fields.  BLM-MT-BI-000054–55; *see also* BLM-MT-BU-000048–49 (projecting 0.007 million tons of GHGs for the Butte lease sale); BLM-MT-HI-000043 (projecting 0.0073 million tons of annual GHG emissions for the HiLine lease sale); BLM-MT-MC-002523 (projecting 0.0167 million tons of annual GHG

emissions for the Miles City lease sale).  In addition to providing specific estimates of downstream GHG emissions, BLM also placed those estimates into context, showing the percentage of total U.S. and Montana GHG emissions that the lease sales would contribute—e.g., for Miles City, 0.0005% of total United States GHG emissions and 0.07% of Montana GHG emissions reported in 2015—and equating those estimates to GHG emissions from cars and homes—e.g., for Miles City, 3,536 cars or the energy used in 1,767 homes.  BLM-MT-MC-002523.

By projecting GHG emissions and analogizing those emissions to other, easily comprehensible emissions sources, BLM satisfied NEPA's requirements. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013) (holding that BLM properly considered a proposed coal mine's cumulative climate change impact where it "evaluated GHG emissions as a percentage of state- and nation-wide emissions"); *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 35–36 (D.D.C. 2014) (holding that BLM sufficiently examined the cumulative impact of a proposed lease sale where it quantified the GHG emissions from the leased parcels and compared them to state-wide and nation-wide emissions).

BLM noted that these GHG emissions could exacerbate climate change impacts.  *E.g.*, BLM-MT-BI-000354.  However, based on current science, it explained that it was unable to predict specific impacts from the GHG emissions

associated with the lease sales.  BLM-MT-BI-004831, BLM-MT-BU-000049, BLM-MT-HI-000043, BLM-MT-MC-002523.

BLM explained that its analysis had uncertainties because, for any given lease, it is difficult for BLM to know whether any wells will be drilled and, if wells are drilled, whether any of the wells will actually produce oil and gas.  From 2007 to 2016, 58 percent of the parcels that BLM Montana offered for lease actually sold and, of the leases that sold, only 56 percent actually involved approved APDs.  E.g., BLM-MT-BI-000345, BLM-MT-HI-002719.  As a further example, of 341 wells drilled within past 20 years in the Billings area, only 171 were completed as either production or service wells.  BLM-MT-BI-000034.  Of those 341 wells, only 40 were on federal oil and gas leases and only 14 of the 40 federal wells, i.e., 35 percent, were completed for production.  BLM-MT-BI-000034.

The uncertainty of future production is heightened in this case because many of the leases are in speculative areas in which the forecast for future drilling is weak.  BLM-MT-BI-000034–37 (showing low or moderate development potential for all Billings lease parcels); BLM-MT-BU-000029 (showing low or very low development potential for Butte parcels); BLM-MT-HI-000029–30 (showing very low, low, or moderate potential for all but two HiLine parcels), BLM-MT-MC-002735–36 (showing low potential for 67,991 lease parcel acres, medium potential

14

for 19,912 lease parcel acres, and high potential for 10,995 lease parcel acres in Miles City area).

By acknowledging assumptions and uncertainties in its calculations and by projecting—to the best of its ability at this stage—potential GHG emissions, BLM satisfied NEPA's "hard look" requirement. *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1109 (9th Cir. 2016) (upholding NEPA analysis where agency "clearly explained the assumptions on which it built the model and the uncertainties inherent in it, thereby identifying the model's limitations").

 2.  *Narrative Explanation of Climate Change and Cumulative Impacts of GHG Emissions*

In addition to its quantitative GHG emissions analysis, BLM also provided narrative explanations of climate change and its effects, including cumulative effects. BLM analyzed climate change in the EISs accompanying each RMP, in the EAs, and in the Climate Change Supplementary Information Report for Montana, North Dakota, and South Dakota, which discussed global temperature increases and effects on agriculture, ecosystems, and human health. BLM-MT-BI-010572, BLM-MT-BI-010628.

BLM noted that the global average surface temperature has increased approximately 1.5°F from 1880 to 2012 and that, in Montana, annual average temperatures have increased between 1901 and 2016 from 41.8°F to 44.6°F

15

statewide.  BLM-MT-BI-000050, BLM-MT-BU-000044, BLM-MT-HI-000039.

Precipitation levels have changed in different regions of Montana, with some areas

seeing an increase of 0.09 inches per decade between 1901 and 2015 and other

areas in Western and North Central Montana seeing decreases of 0.05 and 0.04

inches per decade.  BLM-MT-BI-000050, BLM-MT-BU-000044, BLM-MT-HI-

000039, BLM-MT-MC-002493.

 BLM noted that temperatures in Montana are predicted to increase 3°F to

5°F by the mid-21st century and may rise as much as 9°F by 2099, leading to more

heat waves and reduced water availability.  BLM-MT-BI-000052, BLM-MT-BI-

002021, BLM-MT-BI-002331, BLM-MT-BU-000046, BLM-MT-HI-000041,

BLM-MT-MC-002494, BLM-MT-BI-010635.  In the RMPs and the EAs, BLM

noted that potential climate change impacts include less snowfall; earlier

snowmelt; more frequent, severe, and longer-lasting droughts; and increased

irrigation needs for crops and livestock.  *E.g.*, BLM-MT-BI-000051–52, BLM-

MT-BI-002019, BLM-MT-BI-002332, BLM-MT-BU-000045, BLM-MT-MC-

002494.  Burdens on stressed water systems will increase.  BLM-MT-BI-010623.

 If warming of 3.5°F to 5.5°F occurs, 20 to 30 percent of species would be in

climate zones that are far outside of their current ranges and would likely be at risk

of extinction.  BLM-MT-BI-010630.  Glaciers in Glacier National Park will likely

melt before 2030, BLM-MT-BI-010636, fish populations will decline, BLM-MT-

BI-010636, dangerous heat waves will increase, BLM-MT-BI-010636, and annual area burned by wildland fires in Montana will increase by 241 to 515 percent (according to one referenced study), BLM-MT-BI-000052, BLM-MT-BU-000046, BLM-MT-HI-000041, BLM-MT-MC-002494.  Extreme events such as heavy downpours and droughts are likely to reduce crop yields.  BLM-MT-BI-010629.

Finally, BLM acknowledged that increased global concentrations of GHGs contribute to the global warming impacts described above, and that fossil fuel development and combustion engines cause GHG emissions.  BLM-MT-BI-000051, BLM-MT-BU-000045, BLM-MT-HI-000039, BLM-MT-MC-002493.

Plaintiffs attack the integrity of BLM's climate change analysis, but their real goal is simply to prevent fossil fuel extraction.  *See, e.g.*, Pls.' Br. 10 (asserting that leasing public lands for oil and gas development "perpetuates a path to climate disaster"); Pls.' Br. 18 ("Despite the climate crisis, . . . BLM has sold, and is proposing to sell, millions of acres of oil and gas leases . . . .").  Plaintiffs argue that NEPA is intended to "forestall" climate change.  *Id* at 10.  To the contrary, NEPA does not "does not mandate particular substantive results, but instead imposes only procedural requirements," requiring a "reasonably thorough" discussion of environmental consequences.  *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir. 1994).  Plaintiffs' dislike of the outcome is

17

legally irrelevant.  BLM's narrative and quantitative discussion of climate change satisfied NEPA's requirements.

## B. BLM Took a "Hard Look" at Water Impacts

### 1. *Impacts to Water Quality and Quantity*

BLM's analysis of water quality impacts from the lease sales was similarly thorough, assessing both the quantity of water that oil and gas development on the lease parcels may consume and the potential for contamination.

BLM noted that water resources in the lease areas are essential for agriculture, public water supplies, industry, recreation, and the survival of fish and wildlife.  BLM-MT-BI-000059.  For example, BLM found forty-seven known water wells within 1,000 feet of the proposed Billings parcels.  BLM-MT-BI-000062.

The amount of water used for hydraulic fracturing—a method of well stimulation used on over 50% of oil production and 70% of gas production, BLM-MT-BI-000037—depends on geologic formation and the type of well.  BLM-MT-BI-000041.  BLM noted that shale formations, for example, require large volumes of water, whereas other types of formations, such as the portions of the Williston and Bighorn basins, may require less.  BLM-MT-BI-000041, BLM-MT-BI-013230.  The median volume of water used, per well, for hydraulic fracturing in Montana is 1,455,757 gallons, slightly less than the national median.  BLM-MT-

18

BI-000041; *see also* BLM-MT-MC-000913 ("The amount of water used to hydraulic fracture a Bakken or Three Forks well is approximately 2-4 million gallons of water per well . . . ."). The sources include surface water, groundwater, and wastewater from other hydraulic fracturing operations. BLM-MT-BI-000042. BLM estimated that, over a 20-year period, hydraulic fracturing of federal wells within the Bakken and Three Forks Formation oil wells would use 250 to 490 acre-feet of freshwater. BLM-MT-MC-001224; *see also* BLM-MT-HI-001201 (Between 2003 and 2012, 193.6 million barrels of water were produced in drilling operations in the HiLine area.).

BLM noted that the use of groundwater for hydraulic fracturing could deplete flow in springs and streams. BLM-MT-BI-000065, BLM-MT-HI-000051. Areas reliant on declining groundwater are particularly vulnerable to more frequent and severe impacts from cumulative water withdrawals, including withdrawals for hydraulic fracturing. BLM-MT-BI-000066. Seasonal or long-term drought can increase the frequency and severity of these impacts. BLM-MT-BI-000066. Water withdrawals for oil and gas development could reduce aquifer levels, reduce streamflow, and diminish water quality. BLM-MT-BI-000066, BLM-MT-BU-000057.

BLM also considered impacts to water quantity from coalbed methane production. BLM-MT-BI-012740–41. As much as one million gallons of water

are pumped from each coalbed methane production well during the well's lifetime, and one study noted that companies planned to drill 15,000 coalbed methane wells in the Powder River Basin.  BLM-MT-BI-012740.  Wells have lost water and the aquifer has dropped 200 feet in some areas.  BLM-MT-HI-008149.  Dewatering aquifers can impact soil chemistry, increase potential for coalbed fires, and cause subsidence.  BLM-MT-HI-008149.

BLM acknowledged that oil and gas development could impair water resources both short- and long-term.  BLM-MT-BI-000064.  Surface disturbance, such as the removal of vegetation, could accelerate erosion and diminish water quality.  BLM-MT-BI-000065, BLM-MT-BU-000056, BLM-MT-HI-000051, BLM-MT-MC-001226–27.  For Billings, BLM predicted a maximum of 297 acres of short-term disturbance at 5.4 sites per year.  BLM-MT-BI-000070; *see also* BLM-MT-BU-000030 (predicting 82.5 acres of surface disturbance for Butte), BLM-MT-HI-000030 (predicting a range of 31.35 to 57.2 acres of short-term disturbance and 8.25 to 9.9 acres of long-term disturbance for HiLine); BLM-MT-MC-001644 (predicting 8,700 acres short-term disturbance and 5,700 acres long-term disturbance from oil and gas development for the Miles City area).

Plaintiffs contend that BLM ignored evidence that contamination may occur despite state and federal laws, Pls.' Br. 29, but BLM clearly acknowledged that surface water and groundwater contamination could occur from spills and from the

fluids used in hydraulic fracturing.  BLM-MT-BI-000065–67, BLM-MT-BU-000057, BLM-MT-HI-000051.  BLM listed the conditions in which different fracturing fluids are used and the different types of chemical additives.  BLM-MT-BI-000039, BLM-MT-BU-000033–34, BLM-MT-HI-001566–67.  BLM noted that some of the chemicals used in hydraulic fracturing are "known to be hazardous to human health."  BLM-MT-BI-000040.  Furthermore, coalbed fires that may result from groundwater depletion can create toxic, carcinogenic compounds and can affect drinking water.  BLM-MT-HI-008149–50.

Contamination could occur during the drilling process and, afterward, from improper storage of drilling fluids.  BLM-MT-BI-000066–67, BLM-MT-BU-000057.  BLM cited one study that found 5 to 7 spills of water per 100 active wells between 2010 and 2015 and noted various factors, such as the size of the spill and type of soil, that influence whether a spill reaches drinking water.  BLM-MT-BI-000067–68, BLM-MT-BU-000059.  The potential for contamination from hydraulic fracturing can increase when there is little to no vertical distance between the oil- or gas-formation and fresh water resources.  BLM-MT-BI-000066.  BLM acknowledged the minor potential for cross-aquifer contamination and comingling of waters during well construction.  BLM-MT-BU-000059, BLM-MT-HI-000051.  It further explained that contamination and depletion could be problematic in the short-term, if people are presently using those waters, and in the

long-term, if use becomes necessary because of drought, which becomes more likely with climate change.  BLM-MT-BI-000067, BLM-MT-BU-000058.

Plaintiffs challenge BLM's consideration of water quality impacts, Pls.' Br. 26, but BLM's robust analysis of those impacts, including negative impacts, satisfied NEPA's requirements.  In *Citizens for a Healthy Cmty. v. BLM*, No. 1:17-CV-02519-LTB-GPG, 2019 WL 1382785, at *11–12 (D. Colo. Mar. 27, 2019), the court held that BLM took a "sufficiently hard look" in analyzing water quality impacts from oil and gas development because BLM acknowledged that the "quality of water could be degraded by accidental spills or releases of hazardous substances stored or used at the project sites."  This Court should reach the same conclusion.  Plaintiffs rely on *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 713–14 (10th Cir. 2009), in which the BLM devoted "little" analysis to potential contamination of an aquifer and determined that contamination was "not a realistic concern."  Pls.' Br. 32.  In this case, however, BLM acknowledged that contamination was possible and analyzed possible sources of contamination, thus complying with NEPA's "hard look" requirement.

### 2.  *Additional Analysis at the APD Stage*

BLM's water quality analysis was particularly suitable because, at the leasing stage, BLM lacks the information that it will have at the APD stage and that enables more site-specific analysis.  NEPA allows agencies to defer analyses

until they have a "concrete development proposal" that "crystallizes the dimensions of a project's probable environmental consequences." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800–01 (9th Cir. 2003), *opinion clarified*, 366 F.3d 731 (9th Cir. 2004) (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)); *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006) (rejecting challenge to BLM's NEPA analysis at the leasing stage because the government could examine environmental effects "at later permitting stages when the sites, and hence more site specific effects, are identifiable").

Lease parcels can be hundreds of acres in size, which means that, at the leasing stage, BLM lacks site-specific information about where and how drilling will occur, which is essential for assessing precise water quality impacts. *E.g.*, BLM-MT-BI-000002 (noting that 76 proposed lease parcels in Billings covered 52,297 acres, an average of 688 acres per parcel). Geological formations—including groundwater locations, depth, and quality—vary across the state of Montana, including within lease parcels. *See* BLM-MT-HI-007442–44 (showing underlying geology), BLM-MT-HI-000146–59 (showing parcel maps), BLM-MT-BI-000062 ("Local groundwater conditions within the vicinity of the lease parcels are highly variable."). Operators often combine hydraulic fracturing with directional drilling, BLM-MT-BI-000037, and, without knowing the direction, distance, or depth in which an operator is planning to drill, BLM often cannot

23

know the geological formations that will be impacted.  *See* BLM-MT-BU-000054 (noting "diverse geology of the area"), BLM-MT-BU-000056–57.  In addition, the height of a fracture can determine whether hydraulic fracturing fluids may impact underground sources of drinking water.  BLM-MT-HI-008160.  Shorter fractures are less likely to extend into an underground source of drinking water or connect with natural fracture systems that may transport fluids to an underground source of drinking water.  BLM-MT-HI-008160.  Fracture height is controlled by the geologic formation, the volume and type of fracturing fluid used, the pumping pressure, and drilling depth, which is all information that BLM does not know at the leasing stage.  BLM-MT-HI-008160.

Aside from the variability of geologic formations, water quality impacts can vary depending on factors such as seasonal timing and the condition of vegetation, which again is information that BLM does not know at the lease stage.  BLM-MT-HI-000050.  As the District of Nevada noted, "BLM cannot analyze the effects of every possible type of oil and gas infrastructure on every parcel containing wetlands at the leasing stage" because "BLM cannot reasonably foresee whether any parcels containing wetlands will be sold, what type of surface activity the lessee would want to engage in, and if that surface activity would be near wetland habitats."  *Ctr. for Biological Diversity v. BLM*, No. 3:17-CV-553-LRH-WGC,

24

2019 WL 236727, at *10 (D. Nev. Jan. 15, 2019). That principle applies to groundwater just as much as wetlands.

At the APD stage, however, operators submit specific plans showing their drilling plans (including drilling locations, directions, and depth), estimated depth and thickness of formations, zones potentially containing usable water, and the operator's plans for protecting such resources. BLM-MT-BI-004769. Operators must show that their drilling plans comply with BLM's standards and regulations and with Montana's regulations for protecting groundwater. BLM-MT-BI-000069. For example, Montana regulations require operators to test the well casing to the maximum anticipated fracturing pressure. BLM-MT-BI-000394, BLM-MT-HI-002716, BLM-MT-MC-000913. BLM retains the authority to require modifications to an operator's drilling plan or to disapprove the APD altogether. 43 C.F.R. § 3162.3-1(h); *see also, e.g.,* BLM-MT-HI-000031 (noting that BLM can apply conditions of approval, such as moving the well location, to any drilling permit to protect resources).

While analyzing the proposed Billings lease sale, BLM considered a typical APD for the Bakken Formation to assess the well-specific casing used to protect subsurface resources and the anticipated impacts for a typical well. BLM-MT-BI-011978. BLM decided to hold the lease sale after assessing its ability to further consider water impacts—and potential protection measures—at the APD stage.

25

BLM's consideration of water quality impacts satisfied NEPA's requirements because the agency appropriately analyzed the impacts that it could assess at the lease stage. *See Ctr. for Biological Diversity*, 2019 WL 236727, at *10 ("Whether there would be any harm to wetlands would be better predicted once the lessee submits plans to drill on a parcel containing wetlands because BLM and plaintiffs would have the capability of analyzing the specific impact of the specific type of drilling to the specific parcel.").

## C. **BLM Considered Cumulative Effects**

BLM's RMPs and EISs, plus its thorough climate change and water analyses in the EAs, satisfied BLM's duty to analyze cumulative effects. NEPA and its implementing regulations require agencies to examine the cumulative impacts of their decisions, which means assessing the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of which agency or person undertakes such other actions. 40 C.F.R. § 1508.7.

As a practical matter, analysis of the effects of GHG emissions does not lend itself to a traditional NEPA cumulative effects analysis. Under that traditional analysis, an agency identifies an area where the effects of the proposed project will be felt, estimates the project-level impacts, estimates impacts from other past, present, and reasonably foreseeable projects within the relevant geographic area,

26

and then assesses the cumulative impact of all of those projects combined.  *See, e.g., League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1216 (9th Cir. 2008) (discussing cumulative effects of past, present, and future timber sales in Ochoco National Forest).  GHG emissions and their effect on the climate, however, are necessarily cumulative and necessarily global in nature.  For this reason, BLM estimated direct and indirect project-related GHG emissions, and provided additional context by disclosing the emissions from these lease sales related to the amount of GHG emissions produced in Montana, and the United States, as well as relating the GHG emission predictions from the lease sales to the amount of GHG emissions produced at a Montana coal fired power plant and from driving cars or heating homes.  BLM-MT-HI-000043, BLM-MT-BI-000055, BLM-MT-BU-000048–49, BLM-MT-MC-002523.[6]

---

[6] Plaintiffs argue that BLM was required to include in its analysis a quantification of GHG emissions pertaining to other BLM lease sales.  Pls.' Br. 21.  The relevant regulation, however, does not distinguish between BLM projects and other sources of GHG emissions.  Instead, 40 C.F.R. § 1508.7 provides that, when considering the incremental climate impact of a proposed action "when added to other past, present, and reasonably foreseeable future actions," an agency must account for emissions "regardless of what agency (federal or non-federal) or person" happens to be the source of the emissions.  Because it would be impossible to individually assess the incremental contributions of each individual source of GHG emissions state-wide or nation-wide, BLM reasonably substituted that analysis with an emissions inventory of the same geographic scope.  BLM-MT-MC-002523, BLM-MT-HI-000043, BLM-MT-BI-000055, BLM-MT-BU-000048–49.

BLM then discussed climate change and analyzed changes, such as temperature increases, frequent droughts, and stressed water ecosystems, that may occur both globally and within Montana many decades into the future.  That analysis enabled both the public and the decisionmaker to understand, with the information presently available, the cumulative impacts of global GHG emissions. *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244, 1252 (9th Cir. 2017) (noting NEPA's goal of informed decisionmaking).  BLM also explained that it is not possible tie specific impacts to the incremental increase of GHG emissions from this project or from other foreseeable projects.  BLM-MT-BI-004831, BLM-MT-BU-000049, BLM-MT-HI-000043, BLM-MT-MC-002523. "NEPA does not require the impossible."  *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1121 n.28 (D.C. Cir. 1971) (quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs*, 325 F. Supp. 749, 758 (E.D. Ark. 1971)).

Aside from BLM's thorough analyses projecting climate change impacts well into the future, all the EAs tier to their respective RMPs and accompanying EISs, which contain cumulative impacts analyses.  *E.g.*, BLM-MT-BI-000341, BLM-MT-MC-002849, BLM-MT-MC-001224–29, BLM-MT-MC-001187–90, BLM-MT-BI-002307–22, BLM-MT-BI-2328–38, BLM-MT-BI-2397–99.  The RMP stage is particularly appropriate for analyzing cumulative impacts because

the decisions on which areas to lease, to not lease, or to lease with stipulations are done at the RMP-level in order to examine the larger impacts, including cumulative impacts.  BLM-MT-BI-004730.  The RMP-level analyses are particularly salient in this case because the planning areas for each field office are interspersed with non-BLM managed lands.  *E.g.*, BLM-MT-BI-002372.  And, of course, the NEPA regulations specifically encourage tiering, 40 C.F.R. § 1502.20, which is exactly what BLM did here.

Plaintiffs' contend that the EISs for the RMPs were "unlawfully narrow," Pls.' Br. 24 (citing *WORC*, 2018 WL 1475470), but that argument fails because only the Miles City RMP was challenged in *WORC*.  Furthermore, *WORC* ordered that any new or pending leases of oil or gas resources in the Miles City planning area must analyze downstream combustion, *WORC*, 2018 WL 1475470 at \*19, which BLM did in the Miles City EA, thus satisfying the Court's order.[7]  Plaintiffs cite *San Juan Citizens All. v. BLM*, 326 F. Supp. 3d 1227, 1244 (D.N.M. 2018), to support their challenge to BLM's cumulative effects analysis.  Pls.' Br. 25.  But, in *San Juan*, the BLM had not estimated GHG emissions from downstream combustion at all.  The *San Juan* court found that "the cumulative impact analysis must be conducted anew given BLM's failure to consider downstream greenhouse gas emissions," *San Juan*, 326 F. Supp. 3d at 1249, which is not the case here.

---

[7] The EAs and lease sales pre-dated the WORC order.

Plaintiffs assert that BLM improperly segmented its NEPA analysis, leading to an inadequate analysis of cumulative effects, Pls.' Br. 2, 19, by doing four separate EAs, but each lease sale decision came from a separate field office governed by a separate RMP.  BLM is entitled to organize its operations, including its separate field offices, as it sees fit.  "NEPA does not require agencies to adopt any particular internal decisionmaking structure."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 100 (1983).  More importantly, as explained above, each of the four decisions challenged here was based on NEPA analyses that satisfactorily described cumulative impacts.

### D. <u>**BLM Did Not Need to Prepare an EIS**</u>

Plaintiffs contend that BLM should have prepared EISs for the lease sales because of a 1988 Ninth Circuit case that predates the current three-tier oil and gas decisionmaking structure and because they argue that the impacts from the lease sales are significant, uncertain, and controversial.  Both arguments are meritless.

Plaintiffs cite *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), to contend that BLM was obligated to produce EISs for the lease sales because all the parcels were not covered by No-Surface Occupancy ("NSO") stipulations, which prohibit surface disturbance.  Pls.' Br. 26.  This argument oversimplifies the holding in *Conner* and ignores the multi-stage decisionmaking process for oil and gas development.  In *Conner*, the Ninth Circuit held that the issuance of non-NSO

leases was an irreversible and irretrievable commitment of resources triggering the requirement to comply with NEPA. *Conner*, 848 F.2d at 1449–50. But *Conner* does not stand for the proposition that BLM must prepare an EIS at the leasing stage in all instances. *See N. Plains Res. Council v. BLM*, 298 F. Supp. 2d 1017, 1022 (D. Mont. 2003) (distinguishing *Conner* on the basis that BLM had previously prepared an EIS in conjunction with an RMP); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 3:17-CV-553-LRH-WGC, 2019 WL 236727, at *5 (D. Nev. Jan. 15, 2019) (distinguishing *Conner* because "*Connor* did not discuss the type of analysis to be done at the leasing stage (generic or site-specific), only that one *had* to be done when dealing with non-NSO type leases"). To the extent *Conner* can be interpreted to mean that the preparation of an EIS is required before offering areas for leasing, any such requirement was satisfied here by the preparation of the EISs associated with the four RMPs. In other words, the preparation of an EIS at an earlier stage, not contemporaneous with the leasing decision, is consistent with *Conner*.

Further, *Conner* does not diminish BLM's authority to evaluate the impacts of an oil and gas leasing decision in an EA and to determine, in appropriate circumstances, that the leasing decision will not have significant impacts on the environment. The Tenth Circuit has more clearly articulated the NEPA requirement at the leasing stage, stating that at the lease stage BLM "was required

to analyze any foreseeable impacts" of a leasing decision, not that an EIS necessarily was required. *New Mexico ex rel. Richardson*, 565 F.3d at 718. Thus, while the requirement to comply with NEPA is triggered when BLM decides to offer non-NSO parcels for oil and gas leasing, BLM may still reasonably conclude after preparing an EA that the impacts of the proposed oil and gas leasing decision will not be significant. *See, e.g., Blue Mountains Diversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) ("As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." (citing 40 C.F.R. § 1508.9)).

Moreover, the primary issue in *Conner* was one of timing, and the decision was based on facts that are not present here. The government argued that the obligation to comply with NEPA (i.e., to prepare on EIS) had not ripened because it maintained the authority to require lease stipulations that would prevent significant impacts on the environment. *See* 848 F.2d at 1445. The court accepted that proposition with respect to NSO leases, holding "that the sale of an NSO lease cannot be considered the go/no go point of commitment at which an EIS is required." *Id.* at 1448. With respect to non-NSO leases, however, because such leases do not reserve the right to preclude development altogether, they do constitute an irreversible commitment of resources and trigger the obligation to comply with NEPA. *Id.* at 1450.

32

*Conner* held that an EIS was required, but that holding should be viewed in the context of the case before it. In *Conner*, the lease sale involved 700 leases, granting rights on over 1,350,000 acres within two national forests. *Id.* at 1443–44. In addition, the *Conner* EA found that no significant impacts would occur because the leasing decision itself would result in no ground-disturbing activity and impacts from development could be avoided through lease stipulations, which is a far cry from the thorough analyses in the RMP EISs and the EAs—discussing, inter alia, acres of surface disturbance, downstream GHG emissions, and potential for water contamination—at issue here.

Plaintiffs' challenge to BLM's FONSIs—and its decisions not to prepare EISs—also fails. Pls.' Br. 39. "An agency's issuance of a FONSI is entitled to 'substantial deference.'" *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1145 (D. Mont. 2004) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989)). In challenges to an agency's issuance of a FONSI, the reviewing court must ensure that, in preparing the EA, the agency took a "hard look" at all the relevant foreseeable consequences of a proposed action, in light of their context and intensity, and determined that no "significant impact" to the environment would result. *Mont. Wilderness Ass'n*, 310 F. Supp. 2d at 1145. Context means that "the significance of an action must be analyzed in several contexts such as society as a whole . . ., the affected region, the affected interests, and the locality."

40 C.F.R. § 1508.27(a).  Factors that agencies must consider in assessing intensity include the degree to which impacts are "highly controversial" or "highly uncertain."  40 C.F.R. § 1508.27(b).

Plaintiffs contend that BLM admitted that the impacts of GHG emissions from the lease sales are uncertain, Pls.' Br. 40–41, but Plaintiffs take BLM's statements out of context.  BLM was explaining, in response to public comments, that it did not use the social cost of carbon protocol to assess the impacts of GHG emissions, because of uncertainty concerning the use of that methodology.  BLM-MT-MC-002832.  BLM's comments concerning a proposed (and rejected) methodology do not reflect on the reliability of other aspects of its assessment of GHG emissions.

Plaintiffs also assert there are substantial questions about the lease sales' cumulative effects, Pls.' Br. 41, but, as explained above, BLM's analyses of cumulative impacts satisfied NEPA's requirements.  Finally, Plaintiffs contend that BLM failed to address evidence regarding impacts to groundwater, Pls.' Br. 42, but BLM did do so, as explained above, in considering impacts to water resources.

### E. <u>BLM's Alternatives Analysis Was Sufficient</u>

Plaintiffs critique BLM's analysis of alternatives, Pls.' Br. 35, but this argument lacks merit.

34

First, Plaintiffs did not raise their proposed alternative during the public comment process.  Each draft EA proposed two alternatives: no action and the proposed action, i.e., offering nominated parcels for lease.[8]  Plaintiffs submitted comments suggesting that BLM defer all the lease sales, but BLM's analysis already addressed this scenario, because it was functionally the same as the no action alternative. *E.g.*, BLM-MT-BI-007473, BLM-MT-BI-005959.  An agency need not discuss alternatives similar to alternatives actually considered.  *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 955 (9th Cir. 2008).

After the Butte, HiLine, and Billings NEPA processes had concluded and after BLM decided to hold the March lease sale, Plaintiffs protested BLM's decision and suggested for the first time an alternative applying special groundwater protections.  BLM-MT-BI-004774–75, BLM-MT-BI-004971–72.  Despite waiting until after the NEPA process concluded to offer their proposal,

---

[8] Plaintiffs cite cases involving major agency actions, such as RMP amendments, *Colo. Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1248–50 (D. Colo. 2012), to suggest that BLM's alternatives analysis was insufficient.  Pls.' Br. 38.  Those cases do not apply here where BLM was leasing lands that it had already determined were open for leasing in the RMPs, which did consider multiple alternatives.  BLM-MT-BI-001790, BLM-MT-BI-001793, BLM-MT-HI-000861, BLM-MT-HI-00895, BLM-MT-BU-000582, BLM MT-BU-0006–30, BLM-MT-MC-000655, BLM-MT-MC-000726–26.

Plaintiffs now critique BLM for not considering their proposal in more depth.  Pls.'
Br. 36.

Plaintiffs cannot now fault BLM for its analysis of an alternative that was
not suggested until the protest stage.  Plaintiffs must "structure their participation
so that it is meaningful, so that it alerts the agency to [their] position and
contentions."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S.
519, 553 (1978).  "[C]ourts should not topple over administrative decisions unless
the administrative body not only has erred but has erred against objection made at
the time appropriate under its practice."  *United States v. L.A. Tucker Truck Lines,
Inc.*, 344 U.S. 33, 37 (1952).  The Ninth Circuit has held that BLM properly had
notice of an issue when the advocacy group submitted "extensive comments" in
response to a draft EIS and then raised the issue again in their protest letter.  *Or.
Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1120 n.23 (9th Cir. 2010).  Here,
Plaintiffs' comment letters did not suggest this groundwater-protection alternative
at all.  *E.g.,* BLM-MT-BI-007473.  Plaintiffs should have raised this proposal in
their public comments; because they did not do so, they did not meaningfully alert
BLM to their suggestion at the appropriate time.

Even putting aside Plaintiffs' failure to propose a groundwater protection
alternative in a timely fashion, BLM's NEPA analysis adequately assessed
groundwater impacts and related mitigation measures.  For example, lease

stipulations, which were disclosed in the NEPA documents, prohibit drilling

operations in riparian areas, floodplains, lakeshores, wetlands, or areas subject to

severe erosion.  E.g., BLM-MT-BI-000041, BLM-MT-BI-000069.  Furthermore,

in response to public comments, BLM decided to defer 23 Billings parcels,

portions of two other Billings parcels, and three Butte parcels, BLM-MT-BI-

004709, BLM-MT-BI-000001, BLM-MT-BU-000001.  Of relevance here, BLM

chose to defer the two Butte parcels in particular because they were in source water

protection areas.  BLM-MT-BU-000004, BLM-MT-BU-006654–704.[9]

## VI.   **<u>REMEDY</u>**

The Court should grant Defendants' motion for summary judgment and deny

Plaintiffs' motion for summary judgment.  Nonetheless, if the Court rules for

Plaintiffs, Defendants request separate remedy briefing.  Even if the Court finds

that BLM violated NEPA, vacatur of the leases should not automatically follow.

Plaintiffs challenge only certain portions of BLM's NEPA analysis and do not

challenge any other aspects of the lease sale process, such as BLM's acceptance of

expressions of interest for these parcels; BLM's analysis of cultural, wildlife, and

---

[9] The adequacy of this NEPA analysis was further confirmed in the separate protest stage.  BLM reasonably concluded in denying Plaintiffs' protest that the lease parcels already have stringent resource protections through various stipulations that prohibit surface occupancy or control surface use in certain areas.  *E.g.*, BLM-MT-BI-004710.

historical resources; BLM's consultation with tribes; or BLM's conduct of the actual lease sale (including preparing sale notices, ensuring compliance with electronic accessibility requirements, and accepting bids).

The Court "is not required to set aside every unlawful agency action." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *see also Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1105 (E.D. Cal. 2013) ("It is well established in this Circuit that a Court is not mechanically obligated to vacate an agency decision that it finds invalid."). Whether agency action should be vacated depends on a two-factor test: (1) "how serious the agency's errors are" and (2) "'the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). If the Court rules in Plaintiffs' favor, Defendants should have an opportunity to brief these factors.

## VII.   <u>CONCLUSION</u>

Accordingly, the Court should conclude that BLM satisfied NEPA's requirements, deny Plaintiffs' motion for summary judgment, and grant Defendants' cross-motion for summary judgment.

Respectfully submitted,

Dated:  April 8, 2019                      JEAN E. WILLIAMS
                                                      Deputy Assistant Attorney General

/s/ Rebecca Jaffe
REBECCA JAFFE
Trial Attorney
Attorney for Defendants

## **CERTIFICATE OF SERVICE**

I certify that on April 8, 2019, I electronically filed the foregoing Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment with the Clerk of the Court through the CM/ECF system, which will send notice of the filing to counsel of record in the above-styled case.

s/ Rebecca Jaffe
Rebecca Jaffe

## **CERTIFICATE OF COMPLIANCE**

I certify that, based on the Microsoft Word program, the attached brief contains 8,319 words, excluding the caption, certificates of service and compliance, and tables of contents and authorities.

s/ Rebecca Jaffe
Rebecca Jaffe