# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, MONTANA ENVIRONMENTAL INFORMATION CENTER, DAVID KATS, BONNIE MARTINELL, and JACK MARTINELL, | CV-18-73-GF-BMM |
| Plaintiffs, | ORDER |
| vs. | |
| U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior, DAVID BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior, DONATO JUDICE, in his official capacity as Montana Bureau of Land Management Deputy State Director, | |
| Defendants. | |

## INTRODUCTION

Plaintiffs Wildearth Guardians, et al. (collectively "Wildearth") allege that

Defendants U.S. Bureau of Land Management's, et al. (collectively "BLM") failed

to consider risks to Montana's environment and water supply before issuing 287

oil and gas leases covering 145,063 acres in December 2017 and March 2018 lease

sales. (Doc. 25-1 at 1). Wildearth specifically brings four claims under the National

Environmental Policy Act ("NEPA"). First, Wildearth alleges that BLM failed to

consider the impacts from issuing oil and gas leases on Montana's groundwater

from shallow fracturing and surface casing depth. (*Id.* at 26.) Wildearth also

alleges that BLM failed to consider reasonable alternatives that would lessen the

impacts to Montana's groundwater supply. (*Id.* at 35.) Wildearth next alleges that

BLM failed to consider the combined impacts on climate of the lease sales as a

whole. (*Id.* at 21.) Wildearth alleges finally that BLM improperly determined that

the leases would not significantly impact Montana's environment. (*Id.* at 39.)

## STATUTORY AND REGULATORY BACKGROUND

### *Summary Judgment*

A court should grant summary judgment where the movant demonstrates

that no genuine dispute exists "as to any material fact" and the movant is "entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains

appropriate for resolving a challenge to a federal agency's actions when review

will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest

Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

### *The Administrative Procedure Act*

Courts review agency NEPA decisions under the Administrative Procedure

Act ("APA"). *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1269 (9th Cir.

2017). The APA instructs a reviewing court to "hold unlawful and set aside"

agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Courts should only uphold agency actions under this standard when a rational connection exists between the facts found and the conclusions made in support of the agency's action. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

*NEPA*

NEPA serves as the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA applies when agencies undertake "new proposed 'major Federal action[s].'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013). NEPA protects the environment by requiring federal agencies to "take a 'hard look' at environmental consequences" of their decision-making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). The statute "does not mandate particular results." *Id*. NEPA instead "prescribes the necessary process" that agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Id*.

This necessary process requires agencies to prepare a "detailed statement." 42 U.S.C. § 4332(C). The statement may take different forms. All "major Federal

actions significantly affecting the quality of the human environment" require the agency to prepare an environmental impact statement ("EIS"). *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009) (quoting 42 U.S.C. § 4332(C)). An EIS must include a "full and fair discussion" of the effects of the proposed action, including those on the "affected region, the affected interests, and the locality." 40 C.F.R. §§ 1502.1, 1508.27(a).

NEPA does not always require an EIS to ensure that an agency has taken a "hard look" at potential environmental impacts. *Lockyer*, 575 F.3d at 1012. An agency may comply with NEPA through the preparation of the following documents and accompanying analysis: (1) a less extensive EA and a finding of no significant impact on the environment ("FONSI"); *see* 40 C.F.R. § 1508.9; or (2) a categorical exclusion and finding that the action does not individually or cumulatively have a significant effect on the human environment, *see* 40 C.F.R. § 1508.4.

An agency must consider certain issues regardless of what form the detailed statement takes. These issues include, among others, all "direct," "indirect," and cumulative impacts from an action. 40 C.F.R. § 1502.16; *see* 40 C.F.R. § 1508.7. Agencies also must consider "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii).

4

*MLA and FLPMA*

NEPA applies to many decisions that agencies make when carrying out the Mineral Leasing Act ("MLA") and Federal Land Policy and Management Act ("FLPMA"). The MLA and FLPMA govern BLM's management of oil and gas drilling on public lands. BLM follows a three-stage process to manage oil and gas leasing. *See N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 689 n.1 (10th Cir. 2009)

Resource Management Plan ("RMP") Stage: BLM prepares an RMP, which operates similar to a zoning plan, to define the allowable uses of public lands within the planning area. *See* 43 U.S.C. § 1712. BLM determines at the RMP stage what areas to make open for oil and gas leasing and under what conditions. *See* 43 U.S.C. § 1712(a). BLM prepares an EIS during the RMP stage that evaluates the expected impact of potential land management decisions made in that plan, including oil and gas development. *See Richardson*, 565 F.3d at 692, 703.

Expression of Interest ("EOI") Stage: After lands have been designated as open or closed for oil and gas development at the RMP stage, companies may submit EOIs to nominate specific parcels of land for inclusion in an oil and gas lease sale. BLM makes the lands available through a competitive leasing process if BLM determines the lands to be eligible. 43 U.S.C. § 3120.1-1.

5

Application for Permit to Drill Stage ("APD"): The third stage involves a lessees' submission of applications for permits to drill and BLM's issuance of the leases. BLM's issuance of a lease constitutes "an irretrievable commitment of resources." *See* 43 C.F.R. § 3162.3-1(c).

*Factual Background*

Wildearth's challenge involves two lease sales in Montana – the December 2017 lease sale and the March 2018 lease sale. These lease sales involved four planning areas: HiLine, Billings, Butte, and Miles City. The March 2018 lease sale covered parcels in the Billings, Butte, and Miles City planning areas. Each BLM field office that corresponds to those planning areas prepared an EA and FONSI for only the parcels of land in their area. The December 2017 lease sale offered parcels that fell exclusively in the Miles City planning area.

All four EAs examined two alternatives: (1) no action, and (2) the proposed action of offering the leases for sale. Each of the lease sales "tiered" to the RMP and accompanying EIS. BLM approved the lease sales. BLM concluded that the lease sales comported with the relevant RMPs, national policy, and statutory requirements. BLM determined that the EAs set forth stipulations and lease notices designed to avoid or minimize impacts to resources. Wildearth challenges the lease sales on the grounds that the lease sales fail to comply with NEPA.

## ANALYSIS

### I.   BLM must discuss groundwater impacts with greater specificity.

NEPA's "hard look" obligation requires agencies to consider potential environmental impacts, including "all foreseeable direct and indirect impacts," and "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (quoting *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002)). Whether an impact is "reasonably foreseeable" depends on whether there exists a "reasonably close causal relationship" between the agency's action and the environmental impact. *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1155 (N.D. Cal. 2013).

Neither BLM nor Wildearth dispute that BLM had an obligation to consider the impacts to groundwater from shallow fracturing and surface casing depth. Wildearth correctly points out that BLM had substantial evidence before it that showed (1) there was a potential risk to drinking water from a failure to extend surface casing below drinking water sources, and (2) there was a potential risk to groundwater from shallow hydraulic fracturing. (*See* Doc. 25-1 at 27-28.) This evidence and Wildearth's protest triggered NEPA's hard look requirement for BLM. *Kempthorne*, 457 F.3d at 975.

BLM claims that it took a hard look at both of Wildearth's complaints. BLM walks through all the places in the various EAs where it addressed Wildearth's complaints. Many of the citations on which BLM relies prove irrelevant to Wildearth's specific complaints. For example, BLM spends nearly three pages of its cross-motion for summary judgment discussing how the leases would impact water quantity. (Doc. 29 at 18-20.) This summary of BLM's analysis might be useful if Wildearth had brought claims that BLM had failed to analyze how the lease sales would affect water supply. Wildearth did not. Similarly, BLM cites its discussion of "[s]urface disturbance" and how it "could accelerate erosion and diminish water quality." (*Id.* at 20.) Wildearth brings no claims related to surface disturbance and its effect on water quality. BLM discusses how the improper storage of drilling fluids could cause groundwater contamination. (*Id.* at 21.) BLM recognized that "areas that rely on declining groundwater are vulnerable to impacts from hydraulic fracturing withdrawals." (*Id.* at 21.) These descriptions again prove interesting, but irrelevant. A weatherman proves unhelpful if he says "it's going to be windy tomorrow" when asked if it will rain. BLM proves just as unresponsive here.

The rest of BLM's responses prove similarly deficient as BLM merely recites a list of facts about hydraulic fracturing spills without providing specific responses to Wildearth's complaints about the potential role of shallow fracturing

and surface casing depth in fracturing spills. For example, BLM states that it "acknowledged that surface water and groundwater contamination could occur from spills and from the fluids used in hydraulic fracturing." (*Id.* at 20-21.) BLM notes that "chemicals used in hydraulic fracturing are 'known to be hazardous to human health.'" (*Id.* at 21.) BLM also asserts that it acknowledged that the HiLine region had a low potential for groundwater contamination because thousands of feet and impermeable layers typically separated groundwater and oil reserves. (Doc. 31 at 11.)

All of these statements mirror Wildearth original complaints regarding what role shallow fracturing and surface casing depth will play in spills and how will groundwater be affected. Our erstwhile weatherman proves similarly unhelpful when he says "it's going to rain" after someone asks how much it will rain tomorrow. He hits closer to the mark than he did with his windy response, but not close enough.

BLM relies on a third category of statements that it argues analyze adequately the issues raised by Wildearth. (*See* Doc. 31 at 10-11.) This third category of statements also fails to satisfy NEPA because they lack the specificity necessary to comply with NEPA at the leasing stage. For example, BLM cites to the Billings sale EA and suggests that it "acknowledge[ed] that potential for contamination from hydraulic fracturing can increase when there is little to no

vertical distance between the oil- or gas-formation and freshwater resources." (*Id.*) This statement informs Wildearth and the public what they already know.

BLM's statement that it previously had analyzed an APD that showed the drilling depth would be 20,015 feet and surface casing depth would be 1,800 feet does not move the analysis any closer to NEPA compliance. To be aware that surface casing does not extend to the full length of a well bore says little about the impacts of this fact on groundwater. (*See id.* at 11.) BLM's defense that it "noted that surface casing must be properly set and cemented to protect surface aquifers from contamination and that usable water may exist at greater depths than the surface casing extends" falls short. This statement, like the others, brings nothing new to the analysis and fails to satisfy NEPA's hard look requirement. (*See id.*)

These statements all fail to satisfy NEPA's hard look requirement because, at best, they prove to be "general statements about 'possible' effects and 'some risk.'" *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998)); *see Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004). The Ninth Circuit in *Klamath-Siskiyou* held that an EA proved inadequate because it provided nothing but "general statements" about possible effects. The EA "informed [the reader] only that a particular environmental factor will be 'unchanged,' 'improved,' or 'degraded,' and whether that the change would be

10

'minor' or 'major.'" 387 F.3d at 994. The EA failed to tell "the reader . . . what data the conclusion was based on, or why objective data cannot be provided." *Id.* Here, BLM fails to provide even the information that the Ninth Circuit found lacking in *Klamath-Siskiyou*. The EAs, as discussed above, largely fail to inform the reader whether groundwater would be unchanged, improved, or degraded and it certainly fails to explain what data would lead to these conclusions. *See Klamath-Siskiyou*, 387 F.3d at 994.

Of note, none of the cases that BLM cites in its cross-motion for summary judgment prove contrary. In *Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003), the Ninth Circuit allowed the National Park Service to defer analysis to future decisions for a comprehensive management plan. *See id.* at 801. This plan merely provided "broad guidelines for future approved actions" and did not "constitute[] an irreversible and irretrievable commitment of resources." *Id.* (quotation marks omitted) (quoting *California v. Block*, 690 F.2d 753, 801 (9th Cir. 1982)). BLM's issuance of the leases at issue here, by contrast, constitutes an "irreversible and irretrievable commitment of resources." Further, the agency in *Norton* conceded that it would need to "prepare appropriate environmental review ([pursuant to the] National Environmental Policy Act, National Historic Preservation Act, and other relevant legislation) for . . . future actions" guided by the comprehensive management plan. *Id.* (alterations in original). The agency

11

further conceded that this review "will include, where appropriate, data-gathering and analysis of system-wide impacts." *Id.* The future actions contemplated in *Norton* would be analogous to the leasing phase in this case, meaning that BLM needs to analyze potential "system-wide impacts." *Id.*

BLM's reliance on *Citizens for a Healthy Community v. BLM*, 377 F. Supp. 3d 1223 (D. Colo. 2019), also misses the mark. BLM claims that "the court held that [the agency] took a" hard look at water impacts because it "acknowledged that the 'quality of water could be degraded by accidental" fracking spills. (Doc. 29 at 2.) BLM plucks one line out of the district court's order and portrays it as the entirety of the district court's analysis. In fact, the district court in *Citizens for a Healthy Community* relied on an extensive and thorough hard look that BLM undertook.

The plaintiffs raised concerns about "threats to resources and human health from modern oil and gas drilling techniques." *Citizens for a Healthy Community*, 377 F. Supp. 3d at 1241. The district court catalogued the thorough analysis undertaken by BLM. *Id.*, at 1241-42. BLM acknowledged that hydraulic fracturing spills degrade water quality. *Id.* BLM relied on studies about the health impacts of hydraulic fracturing and it "modeled the estimated maximum impacts that could occur from . . . emissions" and found that "health and quality of life related to air quality are not likely to be significantly impacted." *Id.* at 1242. BLM also

"modeled expected cancer risk from suspected carcinogens." *Id.* These items formed a small part of BLM's robust analysis in *Citizens for a Healthy Community* of the potential threats to resources and human health. *Id.* at 1241-42. BLM provided little or no analysis here about the impacts on groundwater from the leases compared to the thorough and responsive analysis provided in *Citizens for a Health Community.*

BLM alternatively argues that it may defer any parcel-specific analysis to the APD stage even if it has failed to provide specific responses to Wildearth's concerns. The Ninth Circuit for decades has held that NEPA requires at least *some* "site specific analysis" at the leasing stage, when this stage represents an "irretrievable commitment of resources." *Kempthorne*, 457 F.3d at 975-76; *see Conner v. Burford*, 848 F.2d 1441, 1450-51 (9th Cir. 1988). BLM's "inability to fully ascertain the precise extent of the effects of mineral leasing" at the leasing stage cannot justify a failure to consider those effects at this stage. *Conner*, 848 F.2d at 1450.

The Ninth Circuit has not necessarily required, however, a parcel-by-parcel analysis. *See Kempthorne*, 457 F.3d at 976. The Ninth Circuit based this decision on the inherent problem created by NEPA's impacts analysis requirement when applied to BLM's multi-stage oil and gas leasing projects. BLM has no guarantee at the leasing stage of what, if any, projects may materialize for that parcel. *See id.*

13

For that reason, the Ninth Circuit has upheld BLM leasing decisions where BLM did not conduct a parcel-by-parcel review for impacts, but instead considered "hypothetical situations that represented the spectrum of foreseeable results." *Id.* The Court now faces the question of whether BLM has undertaken a review of groundwater impacts that proves specific *enough* for these lease sales, not whether BLM must undertake a parcel-by-parcel review for groundwater impacts.

This question proves complicated by another inherent problem with NEPA analysis at the leasing stage: BLM's ability to assess impacts at the leasing stage may vary greatly depending on the impact that it considers. Some impacts, like impacts of oil and gas leasing on wetlands, will vary greatly depending on the location of a well within a specific parcel. *See Ctr. for Biological Diversity v. BLM*, No. 17-cv-553, 2019 WL 236727, at *10 (D. Nev. Jan. 15, 2019). BLM possesses limited ability to predict where wells will be drilled in a parcel with the precision needed to determine wetlands impacts. As a result, BLM's analysis may be relatively general at the leasing stage, but still may comply with NEPA. *See id.*

Some impacts do not depend on placement within a parcel though and courts have required more specific analyses of these impacts at the leasing stage. For example, courts have required BLM to provide relatively specific estimates regarding potential greenhouse gas emissions at the leasing stage. *See Wildearth Guardians v. Zinke*, 368 F. Supp. 3d 41, 67-68 (D.D.C. 2019). Similarly, courts

14

have required a more specific analysis at the leasing stage when addressing the issue of potential water usage. *See San Juan Citizens All. v. BLM*, 326 F. Supp. 3d 1227, 1254 (D.N.M. 2018). The district court in *San Juan Citizens Alliance* determined that BLM possessed "sufficient information" at the leasing stage "to make estimates of potential water usage for different methods of hydraulic fracturing." *Id.* The district court required BLM to perform this analysis even though "estimates of the impact of the action on water quality will become even more precise" at the permitting stage. *Id.* These decisions lead to the conclusion that the Court must analyze whether BLM undertook an analysis sufficiently specific for the leasing stage based on the unique characteristics of the impact at issue.

A comparison of BLM's analysis of groundwater impacts from shallow fracturing and surface casing depths and the factual record shows that BLM improperly deferred its analysis to the APD stage. BLM provides almost no analysis related to shallow fracturing and surface casing depth. The factual record, on the other hand, shows that BLM possessed the information necessary to undertake a more specific analysis at the leasing stage than it did. Wildearth correctly argues that BLM had access to records showing "aquifer depth and quality in the areas where the leases are located" and "records of existing wells drilled in the area." (Doc. 30 at 13.) The record also includes "an EPA study

identifying where shallow fracturing is most likely to occur in Montana." (*Id.*) This information alone would allow BLM to forecast any potential impacts to groundwater from surface casing depth and shallow fracturing at the leasing stage. *See San Juan Citizens All.*, 326 F. Supp. 3d at 1254.

The Court emphasizes that BLM's analysis must include some sort of forecasting on potential groundwater impacts, but it does not need to include the type of parcel-by-parcel analysis that Wildearth seeks. BLM correctly points out that at least some of the factors that BLM would need to assess the full impacts to groundwater from shallow fracturing and surface casing depth depend on the location of wells. (Doc. 31 at 11-12.) Without that information, BLM cannot, and need not, provide the site-specific analysis that Wildearth requested to satisfy NEPA. *See Ctr. for Biological Diversity*, 2019 WL 236727, at *10.

In sum, BLM failed to take a hard look at groundwater impacts due to shallow fracturing and due to surface casing depth not extending past drinking water. BLM has the information available to it at the leasing stage to provide some forecast about how shallow fracturing and surface casing depth will affect groundwater. BLM need not forecast groundwater impacts for each individual parcel within a lease, though, and instead may satisfy NEPA's hard-look requirement with a forecast as specific as the information it has at the leasing stage

16

allows. The requisite level of specificity may vary depending on the characteristics of each lease sale and the parcels in it.

## II.   BLM failed to consider an alternative that would have protected groundwater.

At the protest stage, and after BLM had issued the relevant EAs and FONSIs, Wildearth submitted a protest, alleging that the lease sales violated NEPA for failure to consider alternatives that "would have protected usable groundwater, including an alternative whereby parcels would not be leased in area overlying usable groundwater, and an alternative that includes other measures to ensure that all usable groundwater zones are protected." BLM-MT-BI-004774. Among those "other measures," Wildearth suggested an alternative that required "a lease stipulation or lease notice requiring the lessee to perform groundwater testing prior to drilling to identify all usable water." *Id.* Wildearth now argues that BLM violated NEPA by failing to consider the alternatives suggested in its protests. (Doc. 24-1 at 35-39.)

NEPA regulations require an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a); *Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017). Agencies need to evaluate only alternatives that are reasonably related to the purposes of the action. *See Wild Wilderness*, 871 F.3d at 728; *League of Wilderness Defs.—Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012).

17

NEPA regulations do not outline a numerical requirement to satisfy the alternatives requirement. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).

NEPA does not provide an agency with complete discretion, however, as to how many alternatives to analyze. An agency must "briefly discuss" why it chose to eliminate any alternative proposed, but not evaluated. 40 C.F.R. § 1502.14(a). The existence of "a viable but unexamined alternative renders [an] environmental impact statement inadequate." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quotation marks omitted) (quoting *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985)). The need to consider alternatives stands "lessened but still extant when preparing an EA instead of an EIS." *Wild Wilderness*, 871 F.3d at 728; *see* 40 C.F.R. § 1508.9(b).

The parties disagree over the detail that BLM had to provide in denying Wildearth's protest because Wildearth did not raise this exact alternatives argument during the NEPA process. (*See* Doc. 31 at 14-15.) Regardless of how much detail BLM must provide at the protest stage, at minimum, it has to respond to the protest with sufficient detail to explain why it has complied with NEPA. To hold otherwise would negate much of the purpose of the protest process. Interested parties frequently bring up NEPA violations at the protest stage. *See, e.g.*, BLM-MT-BI-004709, BLM-MT-BI-004711, BLM-MT-BI-004727-4736, BLM-MT-BI-

004764-4775, BLM-MT-BI-004778-4790, BLM-MT-BI-004852-4862. BLM bears the responsibility to remedy a valid NEPA claim if a protest raises a valid claim. There would be no point otherwise in a member of the public raising a NEPA violation at the protest stage. BLM offers no reason why it could allow a NEPA violation to go unresolved solely because the party failed to bring up the exact NEPA violation at an earlier point. *See generally W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1228 (D. Idaho 2018) (discussing purpose and importance of protest period for oil and gas lease sales).

With that in mind, BLM's response to Wildearth's protest failed to explain adequately why not considering Wildearth's alternative complied with NEPA. BLM's response fails to address the proposed alternatives in Wildearth's protest. Wildearth suggests that BLM consider both an alternative "whereby parcels would not be leased in areas overlying usable groundwater" and alternatives that imposed lease stipulations about groundwater testing and specific casing and cementing depths. BLM-MT-BI-004774. BLM responded to Wildearth's proposed alternative by stating summarily that because "these parcels have stringent resources protections for all relevant resources (NSO, CSU), there was no need to analyze an alternative excluding such parcels." BLM-MT-BI-004775.

BLM did not claim at the time, or in its briefing, that Wildearth's alternative was unreasonable or infeasible. BLM claims instead that its response and the

19

remainder of its alternative analysis proved enough. (Doc. 29 at 34-37.) BLM did not consider Wildearth's proposal and makes no effort to claim that the proposal was unreasonable or infeasible. The Court must consider, therefore, only whether BLM provided an appropriate explanation for not considering Wildearth's proposed alternative. 40 C.F.R. § 1502.14(a); *see Muckleshoot Indian Tribe*, 177 F.3d at 814.

BLM has a lesser obligation to consider alternatives for an EAs than for an EIS. *Native Ecosystems*, 428 F.3d at 1246. The Court takes no issue with the amount of detail that BLM provided here in response to Wildearth's proposed alternative. *See id.* The Court instead takes issue with the substance of BLM's response and finds its lacking. BLM's response tells Wildearth nothing about *why* a no-surface occupancy stipulation or a controlled surface use stipulation serve as adequate stand-ins for the stipulations that Wildearth proposes. BLM did not start from a blank slate when it received Wildearth's proposed alternative at the protest stage in light of the other comments that BLM had fielded during the NEPA process about groundwater and failure to address reasonable alternatives. BLM cannot satisfy NEPA without some explanation beyond the conclusory one that it provided to Wildearth.

Other courts have determined that agencies had failed to satisfy NEPA's alternatives requirement where the agency provided an inadequate explanation for

not considering the proposed alternative. The Ninth Circuit rejected the Forest

Service's alternatives analysis for this reason in *Muckleshoot Indian Tribe*, 177

F.3d at 813. The EIS there considered only a no-action alternative along with two

virtually identical alternatives. The Ninth Circuit noted that "nothing in the record"

supported the Forest Service's reason for failing to consider other alternatives. The

district court in *Colo. Envtl. Coal. v. Salazar,* 875 F. Supp. 2d 1233, 1248–50 (D.

Colo. 2012), similarly determined that BLM had failed to satisfy NEPA's

alternatives requirement because BLM's response to a proposed alternative "never

consist[ed] of more than a statement that it did not specifically consider" the

alternative.

　　　Even when the Ninth Circuit has upheld an agency's decision to consider

only two alternatives, it did so only "[s]o long as 'all reasonable alternatives' have

been considered *and* an appropriate explanation is provided as to why" the agency

did not consider any proposed alternatives. *Native Ecosystems*, 428 F.3d at 1246

(emphasis added); *see Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005,

1016 (9th Cir. 2006) (holding that agency adequately considered alternatives

because explanations for eliminating alternatives "were not arbitrary or

capricious"). BLM relies on *Native Ecosystems* and *Environmental Protection* to

claim that it needed to consider only two alternatives. (Doc. 31 at 13-14.) Both

cases explicitly state, however, that agencies must provide explanations for why it

did not consider any eliminated alternative. *See Native Ecosystems*, 428 F.3d at

1246 (noting that an agency satisfies the regulatory requirement when "an

appropriate explanation is provided as to why an alternative was eliminated");

*Envtl. Prot. Info. Ctr.*, 451 F.3d at 1016 (noting that agency's explanations for

eliminating proposed alternatives "were not arbitrary or capricious"). BLM failed

to provide any "appropriate explanation" for failing to consider Wildearth's

proposed alternative. *Native Ecosystems*, 428 F.3d at 1246. These considerations

and the reasoning in the cited cases lead the Court to conclude that BLM failed to

provide an adequate explanation of why it failed to consider Wildearth's proposed

alternative. *See id.*

**III.   BLM failed to consider cumulative climate impacts.**

All parties have moved for summary judgment on the issue of whether the

challenged EAs satisfy NEPA's cumulative impacts requirement. NEPA requires

that an agency consider the incremental impact of each leasing decision that is

"added to other past, present, and reasonably foreseeable future actions regardless

of what agency (Federal or non-Federal) or person undertakes such other actions."

40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but

collectively significant actions taking place over a period of time." *Id.*

"In a cumulative impact analysis, an agency must take a "hard look" at all

actions." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d

592, 603 (9th Cir. 2010). An agency cannot satisfy this requirement under NEPA

with "[g]eneral statements about 'possible effects' and 'some risk'" unless the

agency provides "a justification regarding why more definitive information could

not be provided." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846,

868 (9th Cir. 2005) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,

137 F.3d 1372, 1379-80 (9th Cir. 1998)).

     NEPA requires that the environmental consequences should be considered

together when several projects that may have cumulative environmental impacts

are pending concurrently. *Kleppe*, 427 U.S. at 410. NEPA also requires that

agencies do more than merely catalogue relevant projects in the area. *Great Basin

Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006). An agency instead

must give sufficiently detailed analysis about these projects and the differences

between them. *Id.* The agency must provide sufficient detail in its analysis such

that the analysis will assist the "decisionmaker in deciding whether, or how, to

alter the program to lessen cumulative environmental impacts." *Churchill Cty. v.

Norton*, 276 F.3d 1060, 1080 (9th Cir. 2001) (quoting *City of Carmel-by-the-Sea v.

U.S. Dept' of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997)).

     The district court in *Helena Hunter &* Anglers concluded that the Forest

Service violated NEPA when it failed to catalogue one of its own road projects to

be built in the same area as the challenged project in its cumulative impacts section

23

of the EA. 841 F. Supp. 2d 1129, 1138 (D. Mont. 2009). The Ninth Circuit in

*Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005), also faulted an

agency for failing to catalogue other agency projects in its environmental

assessments and impact statements. The court reasoned that the agency violated

NEPA when it failed to "set forth in sufficient detail" a "description of past timber

harvests and previous environmental harms caused by these past timber harvests."

*Id.* The Ninth Circuit in *Klamath-Siskiyou* noted that BLM failed to comply with

NEPA where it discussed other projects, but offered "no quantified assessment of

their combined environmental impacts." 387 F.3d at 994. In other words, the Ninth

Circuit consistently has required a catalogue of other past, present, and reasonably

foreseeable projects and analysis of that catalogue and "their combined

environmental impacts." *Id.*

BLM provided no catalogue here and little analysis to show the combined

environmental impacts. As Wildearth points out, the individual EAs for Butte,

Billings, and HiLine include no discussion of each other, even though all three EAs

covered land sold *in the same lease sale*. Further, the Miles City lease sale contains

no discussion of the environmental impacts from the other three EAs. These

omissions violate the Ninth Circuits mandate to "give a sufficiently detailed

catalogue of past, present, and future projects, and provide adequate analysis about

how these projects, and difference between the projects, are thought to have

24

impacted the environment." *Great Basin Mine Watch*, 456 F.3d at 971-72; *see*

*Helena Hunter*, 841 F. Supp. 2d at 1138; *Lands Council*, 395 F.3d at 1028.

      Rather than refute that it failed to catalogue other projects, BLM offers a

number of rationales for why the analysis that it provided satisfies NEPA's

cumulative impacts requirement. To start, BLM claims that compliance with the

regulation would be "impossible." (Doc. 29 at 27 n.6.) BLM states that the

regulation "does not distinguish between BLM projects and other sources of GHG

emissions" and BLM cannot "individually assess the incremental contributions of

each individual source of GHG emissions." (*Id.*) Even if the regulation required the

type of assessment that BLM claims, any impossibility would stem from

cataloguing GHG emissions from non-Federal entities or people, not from

cataloguing emissions from Federal Government projects. BLM failed even to

catalogue the Federal Government projects, and thus its impossibility argument

also fails. BLM further undercuts its own argument when it notes elsewhere in its

cumulative impacts analysis that agencies may "characterize the cumulative effects

of past actions in the aggregate without enumerating every past project that has

affected an area." (Doc. 31 at 6 (quoting *Ctr. for Envtl. Law & Policy v. BLM*, 655

F.3d 1000, 1007 (9th Cir. 2011)).)

      BLM also relies on its quantification of greenhouse-gas emissions as support

for complying with NEPA's cumulative impacts requirement. BLM spends more

than six pages describing the process that it used to quantify estimated greenhouse-gas emissions for each lease sale. (*See* Doc. 29 at 9-15 and Doc. 31 at 2.) This information was thorough and necessary for BLM to comply with NEPA, but none of it speaks to whether BLM considered *cumulative* climate impacts.

BLM further claims that it satisfied NEPA's cumulative impacts requirement because it tiered the EAs to the relevant RMPs. (Doc. 29 at 28; Doc. 31 at 2-3.) This argument fails for at least for two independent reasons. First, the relevant RMPs considered only "estimated GHG emissions for BLM-authorized activities *in the planning areas*." BLM-MT-BI-002397 (emphasis added); *see* BLM-MT-MC-001163 (noting that the RMP's cumulative impacts analysis only considered "[a]ctions anticipated . . . in the planning area"). Thus, the RMP for the Billings planning area fails to consider impacts from the Wyoming planning area, even though BLM must consider the Wyoming lease sale in its cumulative impacts analysis to comply with NEPA.

BLM's tiering argument also fails because the RMPs predate the lease sales by more than two years. *See, e.g.*, BLM-MT-BI-002281. The cumulative impact regulations require a catalogue of past, present, and reasonably foreseeable projects at the time of the least sale, not two years ago. BLM has the benefit of two years' worth of information that it did not have at the RPM stage about what constitutes past, present, and reasonably foreseeable projects. BLM's tiering argument might

26

carry some weight if one of the RMP alternatives proved to be the exact scenario that developed over the last two years. It would fail even then, however, as it fails to account for actions outside the planning area for that specific RMP. *See Klamath-Siskiyou*, 387 F.3d at 994.

In arguing that tiering to the RMPs satisfies NEPA's cumulative impacts analysis, BLM notes, as it often does, that NEPA regulations "encourage[]" tiering. (Doc. 29 at 29; Doc. 31 at 3.) The Court agrees. To encourage tiering, however, hardly means that tiering alone proves sufficient to satisfy NEPA's various requirements. NEPA regulations encourage tiering "to eliminate repetitive discussions of the same issues" in different levels of environmental review. 40 C.F.R. § 1502.20. BLM instead has used tiering as a means to avoid discussions of the same general topic, even when no risk of repetition exists.

Further, BLM cannot, as it claims, satisfy NEPA's cumulative impacts analysis simply because it put the emissions from a single lease sale into context with state and national greenhouse-gas emissions. (*See* Doc. 31 at 6-9.) BLM claims that "climate change, and the GHG emissions that contribute to it, are global and cumulative in scale." (*Id.* at 8.) BLM contends that the global nature of climate change prevents it from assessing "the specific effects of GHG emissions from any particular lease sale either on any particular region or on the planet as a whole." And thus, according to BLM, "both the decision-makers and the public are

27

better served by a cumulative effects analysis . . . that relate a particular project's direct and indirect GHG emissions" to state and national emissions. (*Id.* at 8-9.)

Climate change certainly poses unique challenges in the cumulative impact analysis. BLM's argument nonetheless fails for a number of reasons to persuade this Court that it has satisfied NEPA. To start, these unique challenges do not obviate the need to follow Ninth Circuit case law. This case law requires a catalogue of past, present, and reasonably foreseeable projects. *See Great Basin Mine Watch*, 456 F.3d at 971-72. Further, even though BLM cannot ascertain exactly how all of these projects contribute to climate change impacts felt in the project area, it knows that less greenhouse-gas emissions equals less climate change. *See* BLM-MT-BI-000051, BLM-MT-BU-000045, BLM-MT-HI-000039, BLM-MT-MC-002493 (acknowledging that increase of global concentrations of GHGs contribute to climate change and that oil and gas development cause GHG emissions).

Third, the large-scale nature of environmental issues like climate change show why cumulative impacts analysis proves vital to the overall NEPA analysis. The cumulative impacts analysis was designed precisely to determine whether "a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact." *Klamath-Siskiyou*, 387 F.3d at 994. The global nature of climate change and greenhouse-gas emissions means that any

28

single lease sale or BLM project likely will make up a negligible percent of state and nation-wide greenhouse gas emissions. *See Ctr. for Biological Diversity*, 538 F.3d at 1217. Thus, if BLM ever hopes to determine the true impact of its projects on climate change, it can do so only by looking at projects in combination with each other, not simply in the context of state and nation-wide emissions. *See id.* Without doing so, the relevant "decisionmaker" cannot determine "whether, or how, to alter the program to lessen cumulative impacts" on climate change. *Churchill Cty.*, 276 F.3d at 1080 (quoting *City of Carmel-by-the-Sea*, 123 F.3d at 1160). The global nature of climate change complicates an assessment of the exact climate change impacts from the lease sales. This complication does not preclude BLM from complying with the Ninth Circuit's mandate to catalogue past, present, and reasonably foreseeable projects. *See Great Basin Mine Watch*, 456 F.3d at 971-72.

The cases on which BLM primarily relies do not prove contrary. (Doc. 29 at 13 (citing *Wildearth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) and *Wildearth Guardians v. BLM*, 8 F. Supp. 3d 17 (D.D.C. 2014)) and Doc. 30 at 3-4 (citing *Citizens for a Healthy Cmty. v. BLM*, No. 117-CV-02519, 2019 WL 1382785 (D. Colo. Mar. 27, 2019)). All of those cases come from out-of-circuit courts and thus cannot compel this Court to contradict Ninth Circuit case law. More importantly, two of the cases comport with the Ninth Circuit case law.

29

The D.C. Circuit considered in *Jewell* a similar issue to the one that Wildearth raises here: whether an agency acted arbitrarily and capriciously in failing to include eleven other pending lease applications in a challenged EIS. The D.C. Circuit determined that the agency did not need to include the eleven projects. *Jewell*, 738 F.3d at 310. The D.C. Circuit reached this conclusion, however, only because the projects were not "reasonably foreseeable" and thus did not fall within the requirements of § 1508.7. *Id.* Only four of the proposed leases had been through the EIS process when BLM had issued the FEIS on the challenged action in 2008. Seven of the leases had not yet passed the "scoping" phase. *Id.* The D.C. Circuit rejected plaintiffs' reliance on these eleven proposed leases at the time of the briefing in 2011 as "hindsight." *Id.* "[P]rojects in their infancy have uncertain futures," and, thus, it would have been unreasonable to require BLM to consider every proposed lease from its analysis of foreseeable future actions. *Id.* (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010).

The district court in *Wildearth Guardians v. BLM* upheld the agency's cumulative impacts analysis where BLM analyzed the emissions from "other [area] mines" and emissions from "other pending leases." *Wildearth Guardians*, 8 F. Supp. 3d at 35. BLM estimated the greenhouse gas emissions from the proposed leases and put that estimate into context of state-wide emissions. *Id.* BLM did the

same here. (Doc. 29 at 13.) BLM's cumulative impacts analysis largely ends at this point. By contrast, BLM went much further in *Wildearth Guardians*. BLM considered this quantification of greenhouse gas emissions for the proposed leases "in combination with coal mining at other [Powder River Basin] mines and with other pending leases." *Id.* The EIS further discussed emissions and by-products of coal combustion and estimated the $CO_2$ emissions that would result from coal combustion from all Powder River Basin mines for the year 2006 at 716.9 million metric tons. This amount represented 33.6 percent of all estimated $CO_2$ emissions from coal combustion in the United States. *Id.* BLM's analysis here falls well short of the analysis conducted in *Wildearth Guardians*. These decisions fail to support BLM's claim that an agency complies with NEPA simply by quantifying anticipated new emissions from the action that is the subject of the EA or EIS and then calculating what percentage of national-level and state-level emissions that the new emissions would comprise.

BLM must catalogue past, present, or reasonably foreseeable projects in the EAs. *See Great Basin Mine Watch*, 456 F.3d at 971-72. BLM need not do the impossible, but cases like *Wildearth Guardians*, 8 F. Supp. 3d at 35, show that BLM can do much more than it did here. BLM did much of the work necessary by quantifying GHG emissions from the parcels in the four EAs, but it never went the next step and showed how these lease sales cumulatively affect the environment.

31

**IV.     Whether BLM issued arbitrary and capricious FONSIs.**

Wildearth asks this Court to set aside BLM's FONSIs as arbitrary and capricious and to require BLM to prepare an EIS instead of an EA for the lease sales. The EAs prepared by BLM failed to discuss adequately the impacts on groundwater from surface casing depth and shallow hydraulic fracturing. *See supra* Section I. The EAs failed to provide an appropriate explanation for its decision to exclude consideration of Wildearth's proposed alternatives to the leases. *See supra* Section II. The EAs also failed to address adequately the cumulative impacts of climate change from the proposed leases. *See supra* Section III. All of BLM's FONSIs explicitly rely on these flawed EAs and contain relatively little analysis, most of which directly tracks to the EAs. *See* BLM-MT-BU-000011 (stating that FONSI was based in part on review of EA), BLM-MT-BI-000012 (same), BLM-MT-HI-000006 (same), BLM-MT-MC-000005 (same). Wildearth contends that BLM's reliance on these EAs, which themselves were arbitrary and capricious, also renders the FONSIs arbitrary and capricious. On this claim, they are correct. Given the fact that this matter must be remanded for BLM to conduct a new analysis of the proposed action on various environmental impacts, the Court deems it unnecessary and unwise to resolve whether the lease sales require an EIS, which BLM's may conclude on its own is required after undertaking its new analysis.

32

## V.     Remedy

Wildearth seek the following relief in their Complaint: that this Court declare that "Defendants violated NEPA in approving the lease sales" (Doc. 1 at 33); that this Court set aside as unlawful "the decision records approving the lease sales, the underlying EAs and FONSIs, the protest decisions, and all leases issued pursuant to such sales" (*Id.*); that this Court retain "continuing jurisdiction over this matter until Defendants remedy the violations of law" (*Id.* at 34); and that the Court award to Wildearth "the costs of this action, including reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412," (*Id.* at 33). In its Opening Brief, Wildearth requests the following remedy: declaratory relief and that this Court "set aside (1) the environmental assessments for the December 2017 and March 2018 lease sales; (2) the associated findings of no significant impact; (3) the associated decision records; (4) the decisions to dismiss Plaintiffs' protests of the lease sales; (5) and the leases." (Doc. 25-1 at 50.)

The Court reviewed BLM's decision pursuant to the APA, under which the Court may "set aside" final agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr. for Biological Diversity*, 538 F.3d at 1194. Further, the Court recognizes that "[i]f the record before the agency does not support the agency action [or] if the agency has not considered all relevant factors,. . .  the proper course, except in rare circumstances,

33

is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

The Ninth Circuit remands agency actions without vacating that action only in "limited circumstances." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012); *see Wood v. Burwell*, 837 F.3d 969, 975-76 (9th Cir. 2016) (recognizing that remand without vacatur is a remedy "used sparingly"). When determining whether to leave an agency action in place on remand, courts weigh "how serious the agency's errors are" against "the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). When an agency likely can come to the same conclusion on remand, the "seriousness of the agency's errors" weighs in favor of remand without vacatur. *See Pollinator*, 806 F.3d at 532.

The problems with BLM's EAs largely relate to the absence of analysis rather than to a flawed analysis. In other words, the Court does not fault BLM for providing a faulty analysis of cumulative impacts or impacts to groundwater, it largely faults BLM for failing to provide *any* analysis. Given that absence of analysis, the Court cannot determine whether there exists "a serious possibility that the [agency would] be able to substantiate its decision on remand." *Allied-Signal*,

34

988 F.2d at 151. The Court instead will follow the normal procedure in the Ninth Circuit and vacate the agency's decisions and remand for investigation and analysis consistent with this order. *See Pollinator*, 806 F.3d at 532.

Accordingly, in this case the Court concludes that the proper remedy is to vacate BLM's finding of no significant impact and its issuance of the leases and to remand to BLM for further analysis and action consistent with this opinion.

## ORDER

For the reasons stated herein, the Court grants the following relief requested by Wildearth in its Complaint for Declaratory and Injunctive Relief (Doc. 1):

The Court **VACATES** the findings of no significant impact;

The Court **VACATES** the leases; and

The Court **REMANDS** this matter to BLM for further analysis, consistent with the Court's discussion above, of the environmental impacts of the decision to grant the leases at issue.

DATED this 1st day of May, 2020.

Brian Morris, Chief District Judge
United States District Court